862 A.2d 941

### TOWSON UNIVERSITY

v.

### Michael CONTE.

No. 55, Sept. Term, 2003.

Court of Appeals of Maryland.

Nov. 17, 2004.

Reconsideration Denied Jan. 7, 2005.

70

Mark J. Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Dawna M. Cobb, Asst. Atty. Gen., on brief), for petitioner.

Philip B. Zipin (Omar VIncent Melehy, Zipin, Melehy & Driscoll, LLC, on brief), Silver Spring, for respondent.

Woodley B. Osborne, Osborne & Deutsch, Washington, DC, for Amici Curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE (retired, specially assigned), JJ.

RAKER, J.

In this case, we must decide whether or to what extent a jury may examine or review the factual bases of an employer's decision to terminate an employee in the absence of an express directive from the employment contract. That question has been answered in this jurisdiction with regard to two

different types of employees, the employee at-will and the employee subject to a satisfaction employment contract. We determine the answer with regard to a third type of employee, the employee who may be fired only for just cause.

## I.

The controversy surrounds an employment agreement between Michael Conte, the employee, and Towson University (the University), the employer. In 1996, the University hired Dr. Conte to become the director of the Regional Economic Studies Institute at Towson University (RESI). The University and Dr. Conte executed an employment contract that enumerated Dr. Conte's duties as the new director of RESI, as well as his compensation, period of employment, and the causes for which he could be terminated.

In 1998, several events came to the attention of the University and led to the decision to terminate Dr. Conte. Most of these events centered around RESI's relationship with the State Department of Human Resources (DHR), RESI's primary revenue source. As the owner of RESI's computer database and software, under federal regulations, DHR was entitled to compensation for any income generated by RESI's use of DHR equipment. Dr. Conte was responsible for developing an acceptable methodology for compensating DHR. In June 1998, DHR complained to Dr. Conte about RESI's accounting of that compensation, which was, according to DHR, inconsistent and incomprehensible. Troubled by RESI's accounting procedures, DHR hired a private accounting firm to review them and tried to resolve its issues with RESI through Dr. Conte. None of these attempts was successful, and the relationship between DHR and Dr. Conte deteriorated until the University Provost John Haeger was informed of the dispute and intervened. Although the University eventually was able to save the contract and settle the disputed costs with DHR, it became extremely dissatisfied with the manner in which Dr. Conte had handled the issues and blamed him for the accelerated reduction in DHR's contract by $2,300,000.00 the following fiscal year.

Having lost confidence in Dr. Conte, the University initiated an internal investigation into RESI's activities and accounting procedures. In August of 1998, the University President Hoke Smith directed the University's auditor to examine RESI's records and to determine whether RESI had properly accounted for its expenditures and costs. A preliminary report of the audit in November revealed that personnel costs were documented improperly, in violation of University and federal regulations. In addition, the audit showed that the timekeeping procedures used by RESI attributed to DHR personnel costs which were unrelated to DHR's contract.

In November of 1998, President Smith convened a meeting to discuss RESI's status. The meeting included RESI's associate director, an assistant director, and a former assistant director who had raised concerns about Dr. Conte's management of RESI. Shortly after the meeting, President Smith asked the University's counsel to investigate whether the University had just cause to terminate Dr. Conte. During the investigation, various other problems with RESI came to the University's attention, including irregularities in the services provided to other clients and Dr. Conte's alleged attempt to convert RESI into a private entity. After the meeting, Dr. Conte was informed of the University's intent to terminate him and its request for him to resign.

Because Dr. Conte refused to resign, Provost Haeger sent him a detailed letter explaining the causes for his termination. Alleging "incompetence" and "wilful neglect of duty"—two of the just causes for termination enumerated in Dr. Conte's employment contract—the University cited Dr. Conte's handling of the DHR contract, which resulted in an approximate $2,300,000 revenue loss for the fiscal year 1999; RESI's estimated operating losses of $930,000 for the period between July and December 1998; RESI's failure to abide by federal, state, and University regulations in its record-keeping practices; the dissatisfaction of other clients with RESI's work product; the dissatisfaction of several RESI employees who complained about Dr. Conte's management style; as well as various other reasons for the termination. Dr. Conte disputed

these allegations and said that they did not constitute incompetence or wilful neglect of duty as required by the contract. After a brief hearing before the University President with his counsel, Dr. Conte was formally terminated from his position as director on January 26, 1999.

Dr. Conte filed a complaint in the Circuit Court for Baltimore County against the University, alleging, *inter alia*, that the University had wrongfully discharged him and breached his employment contract. He sought damages for his alleged wrongful termination as director of RESI, the University's refusal to pay him additional compensation as defined by his employment agreement,[1] and the University's failure to appoint him to the faculty after his termination as director as required by the agreement. The University responded to the complaint with several defenses, including the defense that the University had just cause under the contract to terminate Dr. Conte.

In September 2001, trial commenced before a jury in the Circuit Court for Baltimore County. At the close of the evidence and testimony of several witnesses, the trial judge instructed the jury that the "University has the burden to prove by a *preponderance of the evidence* that one or more of the [causes in Dr. Conte's] contract *existed* for the plaintiff's termination" (emphasis added). The trial judge refused the University's request to instruct the jury that, in the event they find just cause to be required under the contract, the University was nevertheless permitted to terminate Dr. Conte for "common law cause" or cause that goes to the "essence of the contract." The jury returned with a verdict in Dr. Conte's favor, finding that the University did not prove by a preponderance of the evidence that just cause existed under the contract to fire Dr. Conte, and awarding him $926,822.00 in damages.

---

1. While discovery was proceeding, the Circuit Court dismissed, on limitation grounds, Dr. Conte's claim for additional compensation for fiscal years 1997 and 1998.

The University noted a timely appeal to the Court of Special Appeals, arguing that the trial court had erred when it instructed the jury that the University was required to show just cause for the termination and when it refused to instruct the jury on common law cause. The Court of Special Appeals, in an unreported opinion, agreed with the Circuit Court and affirmed the judgment.

The University filed a petition for writ of certiorari in this Court to consider two questions.[2] 376 Md. 543, 831 A.2d 3 (2003). Slightly rephrased, the principal question raised in the petition is whether or to what extent a jury may examine or review the factual bases of an employer's decision to terminate an employee. The second question is whether Dr. Conte's employment contract was exclusive in its enumeration of the just causes for which Dr. Conte could be terminated, thereby prohibiting termination based upon any other cause, such as common law cause.[3]

## II.

From petitioner's perspective, a jury's role in disputes involving just cause employees is not to determine whether just cause *in fact* existed, but to determine whether the employer acted in good faith, and not arbitrarily or capriciously, when it decided there was just cause to fire the employee. Put another way, provided the University genuinely believed that Dr. Conte was incompetent or wilfully neglectful of his duties as director, whether Dr. Conte was *actually* incompetent or wilfully neglectful is irrelevant to the jury's inquiry. According to petitioner, then, the jury's inquiry must center

---

**2.** We denied Dr. Conte's cross-petition for certiorari. 376 Md. 543, 831 A.2d 3 (2003).

**3.** Petitioner argues that the burden of proving just cause or the absence thereof lies with Dr. Conte, and that the trial court erred when it assigned the burden to the University. While this issue was raised and argued before the trial and intermediate appellate courts, the issue is not contained in the petition for certiorari, and we will not consider it. *See Maryland State Police v. Zeigler,* 330 Md. 540, 562–63, 625 A.2d 914, 925 (1993)

on the employer's motive and state of mind, not on the actions of the employee and whether they constitute just cause for termination.

■ Underlying petitioner's position is the strong judicial policy against interfering with the business judgment of private business entities. *See Sadler v. Dimensions*, 378 Md. 509, 526–27, 836 A.2d 655, 665 (2003). To that end, petitioner relies heavily on a Court of Special Appeals case, *Elliott v. Board of Trustees*, 104 Md.App. 93, 655 A.2d 46 (1995). Writing for the panel, Judge Cathell, now on this Court, noted that courts and juries should refrain from becoming involved in an employer's personnel decisions, lest they become "super personnel officers," second-guessing an employer about its own business needs. The *Elliott* court gleaned from Maryland precedent that "absent evidence of bad faith on the part of an employer, courts should be reluctant to overturn an employer's decision to discharge an employee when the employer has complied with its own procedures for resolving matters such as this." *Id.* at 108–109, 655 A.2d at 53. Petitioner argues that this rule is applicable to the University's decision to terminate Dr. Conte.

Supplementing the argument, petitioner also asserts that Dr. Conte's employment contract expressly reserved to the University, not to a trial court or jury, the right to determine whether just cause existed, *i.e.*, the fact-finding prerogative. Petitioner reasons that because Paragraph 6.2 of the employment contract establishes a procedure for appeal from the employer's decision to terminate, that procedure necessarily implies that the University had the sole authority to determine whether just cause existed. Relatedly, petitioner argues that absent any express provision assigning the fact-finding prerogative to a third-party or jury, the trial court should not have permitted the jury to determine *de novo* whether just cause had been proved by a preponderance of the evidence. Petitioner urges this Court to "confirm, as have a number of decisions from other states, that an employer reserves the right to terminate an employee for cause unless the employ-

ment agreement expressly contracts away its fact-finding prerogative." In short, petitioner proposes a legal presumption that, in the interpretation of employment contracts, an employer retains all fact-finding prerogatives, absent an express provision stating otherwise.

In response to petitioner's arguments, respondent asserts that petitioner essentially wants to transform an express, just cause employment contract into an at-will employment contract. The cases relied upon by petitioner are almost all in the context of "implied" employment contracts, as in contracts implied from employee handbooks, or "satisfaction" contracts, in which the employer expressly reserves the right to terminate if it deems the employee's performance unsatisfactory. None of the cases deal with an express contract *sans* a satisfaction clause, like the one agreed to by both parties to this litigation.

Furthermore, respondent states that petitioner's reading of the contract distorts its plain meaning, which indicates the intention by both the University and Dr. Conte to permit termination only for just cause. Paragraph 6.2 of the contract merely promises a perfunctory hearing before the President, basically a "rubber-stamp" of the decision to terminate after it unquestionably had been determined already. Respondent argues that under Maryland law, one party is not permitted to retain the ultimate fact-finding prerogative with respect to a breaching event, unless the contract expressly grants the fact-finding prerogative to one of the parties. Respondent cites *Foster–Porter Enterprises v. De Mare*, 198 Md. 20, 81 A.2d 325 (1951), for the proposition that the party asserting a breach of contract must prove the breach actually occurred, not that it was reasonable to believe it occurred. Respondent would have us adopt a rule permitting the jury to second-guess the University's factual determination that it had cause to fire Dr. Conte.

Notably, neither party points to Maryland case law that deals squarely with the jury's role in deciding wrongful termination cases. Both parties rely mainly on cases from other

jurisdictions that have considered this issue and balanced the judicial policy of noninterference with business judgment with that of enforcing contracts meant to ensure job security. In this issue of first impression, we shall consider external authorities, but also our own case precedent, which provides a pathway for our decision.

## III.

### A.

Our analysis begins, as it should, with the language of the employment contract at issue. The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law, subject to *de novo* review. *Sy-Lene v. Starwood,* 376 Md. 157, 163, 829 A.2d 540, 544 (2003); *Calomiris v. Woods,* 353 Md. 425, 434–35, 727 A.2d 358, 362–63 (1999). Maryland courts follow the law of objective interpretation of contracts, *Atlantic v. Ulico,* 380 Md. 285, 301, 844 A.2d 460, 469 (2004); *Sy-Lene,* 376 Md. at 166, 829 A.2d at 546, giving effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean:

> "[A court is to] determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean."

*Calomiris,* 353 Md. at 436, 727 A.2d at 363 (quoting *General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

Paragraph 6 of the employment contract between Dr. Conte and the University governs termination of employment and provides, in pertinent part, as follows:

*6. Termination:*

6.1 The University may terminate this appointment for cause which shall include:

(a) the intentional violation of University of Maryland System Regulations or University regulations

(b) wilful neglect of duty

(c) insubordination

(d) incompetence

(e) misconduct

(f) criminal conduct

(g) long-term physical or mental condition which renders Dr. Conte unable to perform the duties essential to the Director's position

6.2 In the event the University terminates this Appointment, for the above reasons, it shall notify the Director, in writing, of the cause for which termination is sought and the right of the Director to request a hearing by the University President or the President's designee. The hearing must be requested within 30 days of the Director's receipt of the written termination notice. In the event no such hearing is requested, the termination shall become immediately effective.

Two legal consequences relevant to our discussion can be drawn from the language of the contract.

First, Paragraph 6.1 of the contract makes clear that Dr. Conte was not an "at-will" employee. The University could not fire Dr. Conte on a whim, nor could it avail itself of the various legal protections afforded employers who terminate at-will employees. Although employment in Maryland is presumptively at-will, *see Porterfield v. Mascari*, 374 Md. 402, 421–22, 823 A.2d 590, 601–02 (2003); *see also* S. Mazaroff & T. Horn, *Maryland Employment Law*, § 3.01 (2d. ed.2004), a contract, whether express or implied, may over-

come that presumption and create an employment relationship whereby the employee may be terminated only for just cause. *See* 19 *Williston on Contracts* § 54:41 (4th ed.2001). While the language of the contract itself may express a just cause requirement, a contractual delineation of the length of the employment period will also create a just cause employment relationship because by specifying the length or term of employment, the employer usually is considered to have surrendered its ability to terminate the employee at its discretion. *See Shapiro v. Massengill,* 105 Md.App. 743, 661 A.2d 202 (1995); *Chai Management v. Leibowitz,* 50 Md.App. 504, 439 A.2d 34 (1982); *cf. Gill v. Computer Equip. Corp.,* 266 Md. 170, 179, 292 A.2d 54, 58 (1972) (refusing to find a just cause employment relationship in a contract that did not delineate specific term of employment); *McCarter v. Baltimore Chamber of Commerce,* 126 Md. 131, 94 A. 541 (1915) (same). Dr. Conte's contract contains a provision that permits termination only for cause and a provision that sets the time period of his employment,[4] both of which independently establish he was not an at-will employee. The trial court found that he was not an at-will-employee and neither party has appealed this finding.

Second, the language of the contract is ambiguous as to whether the fact-finding prerogative lies with the University. On the one hand, we note the glaring absence of express language directing the fact-finding prerogative to the University. Paragraph 6.2 provides a procedural safeguard for Dr. Conte—a hearing before the President of the University before termination may take effect. But it does not say the President's decision is final, nor does it intimate that the traditional judicial remedy was foreclosed to Dr. Conte if he disagreed with the President's decision. The contract is silent as to adequate investigation, fact-finding, or arbitration in the event of dispute, and it provides no semblance of procedural or evidentiary safeguards that would imply that adjudicatory

---

4. Section 2 of Dr. Conte's employment contract provides a set employment period from April 1, 1996 to June 30, 1999.

discretion is reserved to the University. *Cf. Murphy v. Duquesne University,* 565 Pa. 571, 777 A.2d 418, 433–34 (2001) (noting that it would be unreasonable to believe that an employment contract intended that a carefully elaborated procedure for termination of a tenured professor could be completely circumvented by the filing of a civil action). Rather, all that is promised is a hearing, a meeting, essentially, with the President before termination takes effect, and that is all that Dr. Conte received. It is difficult to read into Paragraph 6.2 an intention by the parties to exclude the traditional remedy in court for contractual disputes.

■ On the other hand, it is just as difficult, if not more difficult, to understand Paragraph 6.2 as having a rational basis for existence unless it was meant to reserve, at some level, the fact-finding prerogative for the University. If the parties intended to permit the relitigation of every fact related to Dr. Conte's termination, why was it necessary to grant Dr. Conte the right to a hearing in the first place? One response is that Dr. Conte's hearing provides an avenue whereby a factual dispute or mistake might be resolved by the parties before resorting to the expensive measure of litigation. But that response is not persuasive with regard to Paragraph 6.2, which grants Dr. Conte the "right" to a hearing. Resolving disputes privately does not require giving the employee the *right* to a hearing as a *condition* for effective termination. That avenue always exists, even in the absence of a provision like Paragraph 6.2. In other words, a hearing would accomplish nothing that would not be accomplished in court before the jury. Paragraph 6.2 would be rendered superfluous, and courts do not interpret contracts in a manner that would render provisions superfluous or as having no effect. *See Walker v. Dept. of Human Resources,* 379 Md. 407, 421, 842 A.2d 53, 61 (2004) (stating that "[w]e also attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect").

Fortunately, we need not address which interpretation is more persuasive because we find that, under either interpretation of the contract, the University retains the fact-finding prerogative. If petitioner's reading of the contract prevails, and the contract expressly reserves the right to the University, then the University retains the fact-finding prerogative, and it was error for the lower courts to permit the jury to be the fact-finder in this case. Nevertheless, because the contract is ambiguous, we will assume, without deciding, that respondent's reading is correct, and that the contractual language does not speak either way on the issue of fact-finding prerogative.

In that case, we must decide, in the employment law sphere, who should *presumptively* retain the fact-finding prerogative. We have already addressed this issue with regard to two different types of employees, the employee at-will and the employee subject to a satisfaction employment contract. We now address this issue with regard to a third type of employee, who, like Dr. Conte, may be fired only for just cause.

## B.

In order to glean guidance on this issue, we start with an analysis of the presumptive fact-finder in the types of employment relationships for which this question has already been answered. In the at-will employment context, we have held that a jury may not review any aspect of the employer's decision to terminate and that the employer may, absent a contravening public policy, terminate an employer for any reason, even a reason that is arbitrary, capricious, or fundamentally unfair. See *Porterfield*, 374 Md. at 422, 823 A.2d at 602; *Suburban Hospital v. Dwiggins*, 324 Md. 294, 310, 596 A.2d 1069, 1077 (1991) (declining the invitation "to impose a general requirement of good faith and fair dealing in at-will employment situations"); *Adler v. American Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981). For our purposes, the significant point is that courts and juries may not review either the employer's (1) motivation or (2) factual bases for

termination in the context of an at-will employment relationship.

■ A jury's review, however, is ratcheted up one step when the employment is pursuant to a "satisfaction" employment contract. *See, e.g., H & R Block, Inc. v. Garland,* 278 Md. 91, 100, 359 A.2d 130, 134 (1976) and cases cited therein. A satisfaction employment contract typically conditions employment on the employer's satisfaction. As we intimated when we first explained satisfaction employment contracts in *Ferris v. Polansky,* 191 Md. 79, 59 A.2d 749 (1948):

> "In a contract where the employer agrees to employ another as long as the services are satisfactory, the employer has the right to terminate the contract and discharge the employee, whenever he, the employer, acting in good faith is actually dissatisfied with the employee's work. This applies, even though the parties to the employment contract have stipulated that the contract shall be operative during a definite term, if it provides that the services are to be performed to the satisfaction of the employer. *It is not necessary that there exist grounds deemed adequate by the trier of facts for the employer's dissatisfaction.* He is the judge as to whether the services are satisfactory. However, this dissatisfaction, to justify the discharge of the employee, must be real and not pretended, capricious, mercenary, or the result of a dishonest design. If the employer feigns dissatisfaction and dismisses the employee, the discharge is wrongful. The employer in exercising the right of dismissal because of dissatisfaction must do so honestly and in good faith."

*Id.* at 85–86, 59 A.2d at 752 (emphasis added). *Polansky* teaches that when an employee is subject to a satisfaction contract, the jury may not review the employer's factual bases for termination, but the jury *is* permitted to review the employer's motive for termination—specifically, the employer's *subjective* motivation. Subjective motivation means whether the employer was *genuinely or honestly dissatisfied* with the employee's services or merely feigning dissatisfaction.

*Id.* In contrast to at-will employment in which a jury may review neither the motivation nor the factual bases of the employer's decision, a satisfaction employment contract permits a jury to review (1) the employer's motivation, limited to his subjective motivation,[5] but not (2) the factual bases for termination, the prerogative of which remains with the employer. *Id.; H & R Block,* 278 Md. at 100, 359 A.2d at 134; *Volos, Ltd. v. Sotera,* 264 Md. 155, 170, 286 A.2d 101, 109 (1972) (noting that the usual rule is that subjective, not objective, standard of review applies to sufficiency of performance issues in satisfaction employment contracts).

Finally, there are employment contracts that grant a greater level of protection from termination than both the at-will and satisfaction employment contracts, by which we mean the just cause employment contract. To what extent may a jury review an employer's decision to terminate when the employer has promised not to terminate except for just cause? At-will employment contracts permit review of neither the employer's motivation nor the factual bases for termination. Satisfaction employment contracts permit review only of the employer's motivation, limited to his or her subjective motivation, but not the factual bases for termination. Just cause employment contracts, such as in the case *sub judice,* logically permit the jury to review with greater scrutiny the employer's decision to terminate than do satisfaction contracts. Does a just cause employment contract require, as respondent posits, a jury's review of the factual bases in addition to the employer's motivation? Or, as petitioner argues, is a just cause contract similar to a satisfaction contract, permitting review of the employer's "good faith," but nothing more?

While we disagree that just cause employment contracts should be treated like satisfaction contracts, we will not

---

**5.** We do not intimate that the subjective standard applies to satisfaction contracts outside the employment sphere. *See First National v. Warren–Ehret,* 247 Md. 652, 658–659, 233 A.2d 811, 814 (1967) (noting that there are different types of satisfaction contracts, dealing with different subject matters, and that the courts have not applied the same rule to all of them).

take the extraordinary step—precluded by our case law in all the employment contracts we have so far encountered—of permitting the jury to scrutinize the factual bases for the decision to terminate. Therefore, we hold that the jury may not review whether the factual bases for termination actually occurred or whether they were proved by a preponderance of the evidence submitted for its review. Instead, the proper role of the jury is to review the *objective* motivation, *i.e.,* whether the employer acted in objective good faith and in accordance with a reasonable employer under similar circumstances when he decided there was just cause to terminate the employee. The jury's inquiry should center on whether an employer's termination was based upon any arbitrary, capricious, or illegal reason, or on facts not reasonably believed to be true by the employer. But the fact-finding prerogative remains with the employer, absent some express intention otherwise. This view, which is in accord with the majority of our sister states that have encountered this precise issue, brokers an appropriate balance between the two views advocated by the parties. *See, e.g., Life Care Centers of America v. Dexter,* 65 P.3d 385 (Wyo.2003); *Almada v. Allstate Ins. Co.,* 153 F.Supp.2d 1108 (D.Ariz.2000); *Thompson v. Associated Potato Growers,* 610 N.W.2d 53 (N.D.2000); *Cotran v. Rollins Hudig Hall Intern., Inc.,* 17 Cal.4th 93, 69 Cal.Rptr.2d 900, 948 P.2d 412 (1998); *Southwest Gas v. Vargas,* 111 Nev. 1064, 901 P.2d 693 (1995); *Braun v. Alaska Com. Fishing & Agr. Bank,* 816 P.2d 140 (1991); *Baldwin v. Sisters of Providence in Washington,* 112 Wash.2d 127, 769 P.2d 298 (1989); *Kestenbaum v. Pennzoil Co.,* 108 N.M. 20, 766 P.2d 280 (1988); *Simpson v. Western Graphics Corp.,* 293 Or. 96, 643 P.2d 1276 (1982); *cf. Gaudio v. Griffin Health Services Corp.,* 249 Conn. 523, 733 A.2d 197, 208 n. 13 (1999); *Wilde v. Houlton Regional Hosp.,* 537 A.2d 1137, 1138 (Me.1988) (refusing to infer term into contract limiting employer's fundamental right to reduce his work force, absent some express provision to the contrary, due to essential business prerogatives and market forces).

In a minority of jurisdictions, the role of the jury is to determine whether the alleged misconduct actually occurred. The leading case for this position is *Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 292 N.W.2d 880 (1980), in which the Michigan Supreme Court held that the trier of fact, not the employer, determines whether there was cause sufficient to warrant the employee's termination. That court reasoned that an employer's promise to discharge only for just cause would be rendered meaningless and illusory if the employer was the final arbiter of the discharge. *Id.* at 895. Therefore, an employer's good faith belief that there was just cause to terminate could not by itself supply cause. In other words, under the *Toussaint* holding, the factual bases of the just cause asserted by the employer must be proven by a preponderance of the evidence to the trier of fact. *See, e.g., Raymond v. International Business Machines, Corp.*, 954 F.Supp. 744, 751–52 (D.Vt.1997); *cf. Schuessler v. Benchmark Marketing and Consulting, Inc.*, 243 Neb. 425, 500 N.W.2d 529, 538 (1993) ("If the employer produces sufficient evidence, the employee may rebut, and if in controversy, the issue goes to the trier of fact; however, the ultimate burden of proving wrongful termination remains with the employee"); *Sanders v. Parker Drilling Co.*, 911 F.2d 191 (9th Cir.1990) (applying Alaska law, cast into doubt *sub silentio* by *Braun*, 816 P.2d 140); *Alegria v. Idaho First Nat. Bank*, 111 Idaho 314, 723 P.2d 858, 875 (1986).

Following closely on the heels of *Toussaint*, however, a case by the Oregon Supreme Court implicitly rejected the *Toussaint* holding. *Simpson v. Western Graphics Corp.*, 293 Or. 96, 643 P.2d 1276, a case involving the disputed nature of threatening remarks made to a co-worker, held that when an employer contracts to discharge only for just cause, it does not, absent indication of some other intent, contract away its inherent right to be the ultimate fact-finder in determining whether just cause existed. Therefore, to justify its decision to terminate, the employer need not prove to the jury that the misconduct or just cause actually occurred by a preponderance of the evidence. 643 P.2d at 1278. As stated by that court:

"In the absence of any evidence of express or implied agreement whereby the employer contracted away its fact-finding prerogative to some other arbiter, we shall not infer it." *Id.* at 1279. In other words, that court, in the absence of a contrary contractual provision, presumptively designated the fact-finding prerogative to the employer.

We agree with the Oregon Supreme Court that absent some express indication otherwise, an employer does not contract away his core function as ultimate fact-finder with regard to an employer's workplace performance. We will not interpret Dr. Conte's employment contract as granting a third-party, the jury, the authority to review the factual bases of the University's decision to terminate him—especially in light of our previous holdings, with regard to satisfaction and at-will employment relationships, that have consistently attributed the fact-finding prerogative to the employer. As Judge Cathell, then on the Court of Special Appeals, aptly warned, "[t]o hold otherwise would be to put the courts in the position of making . . . personnel decisions, acting as a super personnel officer, or of second-guessing a company's decisions." *Elliott,* 104 Md.App. at 110, 655 A.2d at 54 (citation and quotations omitted). Echoing Judge Cathell's admonition, another supreme court that encountered this precise issue has said:

"[Allowing a jury to trump the factual findings of an employer with regard to just cause] would create the equivalent of a preeminent fact-finding board unconnected to the challenged employer, that would have the ultimate right to determine anew whether the employer's decision to terminate an employee. . . . This ex officio 'fact-finding board,' unattuned to the practical aspects of employee suitability over which it would exercise consummate power, and unexposed to the entrepreneurial risks that form a significant basis of every state's economy, would be empowered to impose substantial monetary consequences on employers whose employee termination decisions are found wanting."

*Vargas,* 901 P.2d at 699. We are in agreement with these concerns.

This premise that the employer, not the jury, retains the fact-finding prerogative does not render "illusory" the promise not to terminate except for just cause. In *Cotran v. Rollins Hudig Hall,* the California Supreme Court also agreed with the *Simpson* holding that the jury's role did not encompass that of fact-finder in a wrongful termination case, and it disagreed with the *Toussaint* court that this would render the promise meaningless. Instead, the jury's role was to assess the "objective reasonableness" of the employer's factual determination that just cause existed. 948 P.2d at 419. To flesh out the meaning of objective reasonableness in the employment context, the court explained that just cause required (1) that the employer act in objective good faith (meaning, as we have already stated, good faith from the perspective of a reasonable employer, not of the individual employer), *id.* at 420, and (2) that the employer base its decision on a reasoned conclusion supported by substantial evidence. *Id.* (citing *Baldwin,* 769 P.2d at 304). Such an approach, said the court, achieved a middle ground between the *Toussaint* rule and a toothless just cause doctrine. The *Cotran* court supported its decision with policy considerations it found persuasive in the personnel context:

"As several courts have pointed out, a standard permitting juries to reexamine the factual basis for the decision to terminate for misconduct—typically gathered under the exigencies of the workaday world and without benefit of the slow-moving machinery of a contested trial—dampens an employer's willingness to act. . . .

"Equally significant is the jury's relative remoteness from the everyday reality of the workplace. The decision to terminate an employee for misconduct is one that not uncommonly implicates organizational judgment and may turn on intractable factual uncertainties, even where the grounds for dismissal are fact specific. If an employer is required to have in hand a signed confession or an eyewitness account of the alleged misconduct before it can act, the workplace will be transformed into an adjudicatory arena and effective decisionmaking will be thwarted. Although these features

do not justify a rule permitting employees to be dismissed arbitrarily, they do mean that asking a civil jury to reexamine in all its factual detail the triggering cause of the decision to dismiss—including the retrospective accuracy of the employer's comprehension of that event-months or even years later, in a context distant from the imperatives of the workplace, is at odds with an axiom underlying the jurisprudence of wrongful termination. That axiom . . . is the need for a sensible latitude for managerial decisionmaking and its corollary, an optimum balance point between the employer's interest in organizational efficiency and the employee's interest in continuing employment."

*Id.* at 420–421 (citation omitted). The majority of high courts that have considered the issue are in agreement with California, *see supra,* and so are we.

As outlined above and in addition to the logical progression of our precedent, the practical considerations of running a business overwhelmingly favor a legal presumption that an employer retain the fact-finding prerogative underlying the decision to terminate employment. Indeed, this case is a good example as to why a jury should not be permitted to review the factual bases for termination in the employment context. Because of the strict evidentiary rules of a judicial proceeding, the University was barred from admitting into evidence hearsay statements relied upon by the University in its termination decision. Nevertheless, employers often "rely on hearsay, on past similar conduct, on their personal knowledge of people's credibility, and on other factors that the judicial process ignores," indicating that "[w]hat works best in a judicial proceeding may not be appropriate in the employment context." *Waters v. Churchill,* 511 U.S. 661, 676, 114 S.Ct. 1878, 1888, 128 L.Ed.2d 686 (1994). Similarly, the University alone was in the best position to determine whether there were facts sufficient to constitute "incompetence" and "wilful neglect of duties," the two just causes outlined by the contract as the basis for Dr. Conte's termination. Whether an employee was "incompetent" or in "wilful neglect of duties" is a question that not only requires the special knowledge of the

employer, but it is also so overbroad and vague in its terminology that a jury's attempt to figure out what those terms mean—especially in the context of a highly competitive and complex research institute involving, among other things, various private clients and public interests, interlocking federal and state regulations, and the complex accounting protocol of a large public university—is an endeavor doomed to failure or gross uncertainty.

Respondent refers us to two Court of Special Appeals cases, *Tricat v. Harper*, 131 Md.App. 89, 748 A.2d 48 (2000), and *Foster–Porter Enterprises v. De Mare* as support for the opposite position that the employer was required to prove "actual" cause by a preponderance of the evidence. We do not find these cases relevant to the issue of the jury's role as fact-finder. *Tricat* did not address the issue of a jury's role or "actual" cause, but instead dealt with the proper placement of the burden of proof, an issue not presented in this case, *see supra* n. 3. Respondent fares no better with the *Foster–Porter* case, which does not deal with the employee-employer relationship (although it has occasionally been cited in that context for a different proposition, *see infra* Part IV). Instead, it involved a standard breach of contract dispute between a distributor and manufacturer.

Finally, we are unpersuaded by respondent's argument that many of the cases that have held, as we do, that the presumption of fact-finder lies with the employer apply only to the *implied* contract case. *Cf. Cotran*, 69 Cal.Rptr.2d 900, 948 P.2d at 414 n. 1 (noting that "[w]rongful termination claims founded on an *explicit* promise that termination will not occur except for just or good cause *may* call for a different standard, depending on the precise terms of the contract provision" (second emphasis added)); *Khajavi v. Feather River Anesthésia Medical Group*, 84 Cal.App.4th 32, 100 Cal.Rptr.2d 627 (2000) (holding that unlike wrongful discharge based on an implied contract, employment for a specified term may not be terminated prior to the term's expiration based upon employer's honest but mistaken belief of misconduct), *rehearing and review denied*. First, respondent's premise is incorrect. *See,*

*e.g., Thompson,* 610 N.W.2d at 57–59 (adopting the *Cotran* holding in the context of an express just cause contract); *Manning v. Alaska R.R. Corp.,* 853 P.2d 1120, 1125 n. 2 (Alaska 1993) (applying the same definition of just cause to collective bargaining agreement that expressly stated the employer may take disciplinary action against an employee for "just cause" because this is the "appropriate" standard for just cause discharges). Second, and perhaps more importantly, the reasoning of the cases that adhere to the objective good faith standard in the context of implied contracts apply with equal force in the context of express contracts. Respondent offers no reason why the two should be distinguished. Perhaps respondent and other jurisdictions do not provide rationales for treating differently implied contracts from express contracts because the two do not differ in substance or effect, but only in the manner in which they are formed. Regarding that difference in contract formation, the comment to the Restatement of Contracts explains, "Contracts are often spoken of as express or implied. The distinction involves, however, *no difference in legal effect, but lies merely in the mode of manifesting assent.*" Restatement (Second) of Contracts § 4 cmt. a (1981) (emphasis added).

In sum, we agree with the majority of jurisdictions that have considered this issue and hold that a jury's role in a wrongful discharge case does not include that of ultimate factfinder. Instead, in the just cause employment context, a jury's role is to determine the *objective reasonableness* of the employer's decision to discharge, which means that the employer act in objective good faith and base its decision on a reasoned conclusion and facts reasonably believed to be true by the employer.

## IV.

Although Part III of this opinion resolves the dispute and will require a new trial, we will give guidance on the second question presented, as it will undoubtedly arise again in the litigation. This issue is whether Dr. Conte's employment contract was exclusive in its enumeration of the just

causes for which Dr. Conte could be terminated, thereby prohibiting termination based upon any other cause, such as common law cause. We hold that it was not exclusive. This interpretation of Dr. Conte's employment contract is required by its clear terms, which are unambiguous with regard to this issue and which are reproduced, in pertinent part, as follows:

*6. Termination:*

6.1 The University may terminate this appointment for cause which shall include:

(a) the intentional violation of University of Maryland System Regulations or University regulations

(b) wilful neglect of duty

(c) insubordination

(d) incompetence

(e) misconduct

(f) criminal conduct

(g) long-term physical or mental condition which renders Dr. Conte unable to perform the duties essential to the Director's position

\* \* \*

6.3 The appointment shall terminate for the following reasons:

(a) The Director's acceptance of other employment; the Director's resignation, or the Director's retirement.

(b) Pursuant to Maryland law, if funds are not appropriated or otherwise made available to support continuation of this position on or after July 1, 1997, and the Director chooses not to operate RESI on a self-supporting basis.

(c) The Director's death.

*7. Faculty Appointment:*

In the event the Director is terminated for reasons other than those provided in paragraph 6.1(a) through (g) and 6.3(a), or if this Appointment is not renewed, the Director shall be appointed Professor of economics, with tenure, subject to the University of Maryland System Appointment, Rank and Tenure Policies and Procedures and University

Policies and Procedures on the appointment of tenured faculty, as amended from time to time.

Because we find these provisions clearly and unambiguously manifest an intent by the parties not to limit the just causes for which Dr. Conte could be terminated, we will enforce those terms.

Dr. Conte's contract does not limit the causes for his termination to those enumerated by 6.1(a)—(g) because the language in Paragraph 6.1 of the contract is clear and unambiguous. "The University *may* terminate this employment for cause which shall *include* [the enumerated seven causes]." This language does not expressly or impliedly make those causes exclusive. The word "include" ordinarily means "comprising by illustration and not by way of limitation." *Group Health Ass'n v. Blumenthal*, 295 Md. 104, 111, 453 A.2d 1198, 1203 (1983), *cited with approval in State v. Wiegmann*, 350 Md. 585, 593, 714 A.2d 841, 845 (1998). There is nothing in the language of the contract—such as "shall include only"— that would refute this ordinary understanding of the term and make the seven listed causes exclusive. *See also Thompson*, 610 N.W.2d at 57 (addressing the identical issue, and finding that the list of causes was not exclusive).

This interpretation is further supported by the word "may" in Paragraph 6.1. Connoting a permissive, discretionary action, the word "may" indicates that the University, at its discretion, could terminate Dr. Conte for the seven enumerated causes, but it did not *require* the University to do so. *Cf. Board of Physician v. Mullan*, 381 Md. 157, 848 A.2d 642 (2004); *Spencer v. Maryland State Board of Pharmacy*, 380 Md. 515, 846 A.2d 341 (2004); *Maryland–National Capital Park and Planning Comm. v. Silkor Corp.*, 246 Md. 516, 229 A.2d 135 (1967) (interpreting the word "may" to signal the ordinary meaning of permission unless the context or the purpose of the statute shows that it is meant to be imperative). Paragraph 6.1 manifests an intention to *describe* the types of causes for which Dr. Conte could be terminated, but there is no language signaling the parties intended to *limit* those causes to the ones mentioned.

Second, and perhaps even more compellingly, the textual context of Paragraph 6.1 plainly indicates that the enumerated causes of that paragraph were not exclusive. Paragraph 7 states that, "[i]n the event the Director is terminated for reasons *other than those provided in paragraphs 6.1(a) through (g) and 6.3(a),*" Dr. Conte will be appointed a professor at the University. At the very least, Paragraph 7 anticipates that *some* causes were not listed in Paragraph 6.1.

Respondent argues that the causes "other than those provided for in Paragraph 6.1(a) through (g) and 6.3(a)" refer to 6.3(b) alone and do not imply that "other" just causes might exist. We find this explanation unpersuasive and objectively unreasonable. If the parties had truly intended such a thing, a much more logical, simple, and intuitive way of articulating their intent would have been to use language such as "for the reason stated in 6.3(b) of this contract." Indeed, the plain language of the contract refutes respondent's interpretation, for it uses the plural, "reasons," indicating that the singular reason stated in 6.3(b) is not the only reason for termination contemplated by the contract. To adopt respondent's understanding of the contract would belie common sense.

Therefore, the claim that the contract intended the causes of Paragraph 6.1 to be exclusive is unpersuasive. The implication for petitioner is that the University may base its cause for termination on reasons other than those listed in the contract. *See Regal Savings Bank v. Sachs,* 352 Md. 356, 364, 722 A.2d 377, 381 (1999) (holding that, in the context of employment contracts, unless a provision for termination is in terms exclusive, it is a cumulative remedy and does not bar the ordinary remedy of termination for "a breach which is material, or which goes to the root of the matter or essence of the contract" (quoting *Foster–Porter,* 198 Md. at 36, 81 A.2d at 333) (citations and internal quotations omitted)).

This understanding of the contract does not transform Dr. Conte into an employee at-will. As we have already stated, the contract establishes, and it is conceded, that Dr. Conte could be terminated only for just cause. Thus, as long as the

University bases its termination on just cause, it can do so regardless of whether that specific just cause is included in the contract. However, petitioner concedes that termination based on a cause subject to Paragraph 7 will result in Dr. Conte being appointed to a tenured professorship.

■ In this case, the University could base its termination on "common law cause"—which permits an employer to terminate an employee for a "material breach" of the contract, one that goes "to the essence" of the contract itself—even though that cause is not mentioned in the contract. *See id.* But it could not terminate Dr. Conte at its discretion or for any other reason that would not satisfy the just cause requirement.

■ In his dissent, Judge Eldridge raises two jurisdictional or quasi-jurisdictional issues—that Dr. Conte's only available judicial remedy was to seek judicial review of the administrative decision by the President of Towson, and that his breach of contract action was filed beyond the one year allowed by Maryland Code, § 12–202 of the State Government Article. On the state of the record before us, neither of those issues appears apposite.

Towson University is part of the University System of Maryland. *See* Maryland Code, § 12–101 of the Education Article. Section 12–104(j)(2) of the Education Article makes clear that, except with respect to grievance appeals under Title 13, subtitle 2 of the Education Article, of which this action is not one, the contested case provisions of the Administrative Procedure Act do not apply to the University, and there is, accordingly, no statutory provision for any administrative hearing to which Dr. Conte would be entitled or any APA-type of judicial review of administrative proceedings provided for in his contract.

■ Although, under our case law, the courts have inherent authority, by mandamus or injunction, to review administrative decisions alleged to be arbitrary, capricious, or unlawful in some way (*see, e.g., Criminal Inj. Comp. Bd. v. Gould,*

273 Md. 486, 331 A.2d 55 (1975) and cases cited therein), we have never held that such an action is, in all cases, the sole remedy available or that resort to that avenue of judicial review is a jurisdictional requirement. Dr. Conte was not seeking a *Gould*-type of judicial review of any administrative decision by the President of Towson but was, instead, seeking damages for common law breach of contract. Every breach of contract action against the State involves, to some extent, an allegation that a State agency or official acted improperly and unlawfully in failing to comply with the contract, but this Court has never suggested that, in the absence of an applicable statutory administrative procedure, the plaintiff's only remedy is to seek judicial review of the administrative decision not to comply with the contract through an action for mandamus or injunction.

 With respect to Conte's alleged failure to comply with the one-year limitations period provided in § 12–202 for bringing a breach of contract action against the State, it would appear that his action was, in fact, timely. His contract and employment were formally and effectively terminated on January 26, 1999, and his action was filed on January 24, 2000. Whether Dr. Conte could have sued for injunctive relief prior to January 26, 1999, to preclude Towson University from terminating his contract or for an anticipatory breach of contract—an issue that is not before us—his cause of action for the actual breach did not and could not arise until the contract was, in fact, terminated.

Citing and relying upon *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) and *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam), the dissent maintains that the statute of limitations begins when notice of termination is issued by the employer and not when the termination is effective. Dissenting op. at 116, 862 A.2d at 969. Ricks claimed that the College discriminated against him on the basis of national origin in violation of Title VII and 42 U.S.C. § 1981. The Supreme Court held that the only alleged discrimination occurred at the

time the tenure decision was made and communicated to Ricks, and hence, the filing limitations period commenced at that time. 449 U.S. at 258, 101 S.Ct. at 504. In *Chardon*, plaintiff Fernandez filed a complaint alleging that his termination from the Puerto Rico Department of Education violated 42 U.S.C. § 1983. Applying the holding in *Ricks* that the proper focus is the time of the alleged discriminatory act, the Supreme Court held that the time for filing began to run when plaintiff received his letter of termination because there was no allegation of any discriminatory act after that date. 454 U.S. at 8, 102 S.Ct. at 29. *Ricks* and *Chardon* are inapposite to the case at bar. There is no allegation of discrimination or deprivation of civil rights.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

BELL, C.J. and ELDRIDGE, J., dissent.

BELL, C.J., dissenting.

In this case, Towson University, the petitioner, and Michael Conte, the respondent, entered into an employment contract, pursuant to which the petitioner's right to terminate the respondent's employment was conditioned on there being "just cause" for doing so.[1] Section 6.2 of the

---

1. Paragraph 6 of the Employment Contract addressed the termination of the contract. Section 6.1 provides

"The University may terminate this appointment for cause which shall include:

"(a) the intentional violation of University of Maryland System Regulations or University regulations

"(b) wilful neglect of duty

"(c) insubordination

"(d) incompetence

"(e) misconduct

contract [2] also provided for the notification of the respondent, "in writing, of the cause for which termination is sought" and that the respondent could request a hearing by the President or the President's designee within thirty days of receipt of the notice of termination. The result of the failure to request a hearing, the contract warned, would be that "the termination shall become immediately effective."

The majority accurately characterizes this contractual arrangement as a "just cause" contract, one pursuant to which the employee "may be fired only for cause," *see Towson University v. Michael Conte*, 384 Md. 68, 72, 862 A.2d 941, 943 (2004), as opposed to one in which the employee serves at the will of the employer or subject to the employer's satisfaction. The majority also recognizes, again correctly, that there are substantial differences between these contracts—in an at will contract, the employee is subject to termination "for any reason, even a reason that is arbitrary, capricious, or fundamentally unfair," *id.* at 82, 862 A.2d at 949; in a satisfaction contract, the employee is subject to termination "whenever . . . the employer, acting in good faith is actually dissatisfied with the employee's work," *id.* at 83, 862 A.2d at 949, quoting *Ferris v. Polansky*, 191 Md. 79, 85, 59 A.2d 749, 752 (1948); in a "just cause" contract, the employee is subject to termination only for good cause. *Id.* at 84, 862 A.2d at 950. The latter provides the employee with greater protection from discharge than the other two. *Id.* at 84, 862 A.2d at 950.

---

"(f) criminal conduct

"(g) long-term physical or mental condition which renders Dr. Conte unable to perform the duties essential to the Director's position."

2. Section 6.2 of the contract provides:

"In the event the University terminates this Appointment, for the above reasons, it shall notify the Director in writing, of the cause for which termination is sought and the right of the Director to request a hearing by the University President or the President's designee. The hearing must be requested within 30 days of the Director's receipt of the written termination notice. In the event no such hearing is requested, the termination shall become immediately effective."

Despite its conclusion that "[j]ust cause employment contracts ... logically permit the jury to review with greater scrutiny the employer's decision to terminate than do satisfaction contracts," *id.* at 84, 862 A.2d at 950, and, therefore, should not be treated like satisfaction contracts, *id.* at 84, 862 A.2d at 950, the majority proceeds nevertheless to do just that, treat them like satisfaction contracts.

In defining the fact-finder's limited role in the review of satisfaction contracts, the majority relies on *Ferris v. Polansky*, from which it quotes the rule, as follows:

> "In a contract where the employer agrees to employ another as long as the services are satisfactory, the employer has the right to terminate the contract and discharge the employee, whenever he, the employer, acting in good faith is actually dissatisfied with the employee's work. This applies, even though the parties to the employment contract have stipulated that the contract shall be operative during a definite term, if it provides that the services are to be performed to the satisfaction of the employer. *It is not necessary that there exist grounds deemed adequate by the trier of facts for the employer's dissatisfaction.* He is the judge as to whether the services are satisfactory. However, this dissatisfaction, to justify the discharge of the employee, must be real and not pretended, capricious, mercenary, or the result of a dishonest design. If the employer feigns dissatisfaction and dismisses the employee, the discharge is wrongful. The employer in exercising the right of dismissal because of dissatisfaction must do so honestly and in good faith."

*Towson*, 384 Md. at 83–84, 862 A.2d at 949–50, quoting 191 Md. at 85–86, 59 A.2d at 752 (emphasis added). With respect to the fact-finder's role in the review of "just cause" contracts, it holds:

> "... the jury may not review whether the factual bases for termination actually occurred or whether they were proved by a preponderance of the evidence submitted for its review. Instead, the proper role of the jury is to review the *objective* motivation, *i.e.,* whether the employer acted in objective

good faith and in accordance with a reasonable employer under similar circumstances when he decided there was just cause to terminate the employee. The jury's inquiry should center on whether an employer's termination was based upon any arbitrary, capricious, or illegal reason, or based on facts not reasonably believed to be true by the employer. But the fact-finding prerogative will remain with the employer, absent some express intention otherwise." [3]

*Id.* at 84–85, 862 A.2d at 950.

Underlying this decision, as urged by the petitioner, is "the strong judicial policy against interfering with the business judgment of private business entities," [4] for which proposition the majority cites *Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 526, 836 A.2d 655, 665 (2003) and *Elliott v. Bd. Of Trustees of Montgomery County Community College*, 104 Md.App. 93, 108–09, 655 A.2d 46, 53 (1995). *Towson*, 384 Md. at 76, 862 A.2d at 945. Also critical to the majority decision is the fact that the contract language fails to address definitively, one way or the other, the question of who, as between the jury and the employer, will perform the fact-finding function, *id.* at 80, 862 A.2d at 948, thus, requiring it, the majority, to determine which presumptively should do so. *Id.* at 82, 862 A.2d at 948–49. Refusing to interpret the contract at issue as

---

**3.** This latter statement is curious. By limiting the employer's right to discharge its employee, except for "just cause," I would have thought that the contract provision to that effect was an "express intention otherwise."

**4.** The petitioner is, to be sure, a public university and not, as Judge Eldridge, in dissent, points out, 384 Md. 68, 72, 862 A.2d 941, 943 (2004) (Eldridge, J. dissenting), a private business entity. Public universities, however, can be, and indeed must be, held to their contracts, even their employment contracts. Adoption of the position espoused by the Eldridge dissent with respect to the review to which the respondent is entitled, although with a different appellate focus, would leave the respondent no better, if not worse, off than he would be under the majority formulation-in either case, the decision as to his employment fate is left to the party to the contract who agreed that the respondent could be dismissed only for cause, without, expressly or otherwise, reserving to itself the right to determine whether, and when, cause existed.

granting a third party the authority to review the factual basis for the employer's termination decision, the majority concludes that the "fact-finding prerogative" rests with the employer. *Id.* at 86–87, 862 A.2d at 951–52. It reasons, agreeing with the Oregon Supreme Court, that "absent some express indication otherwise,[5] an employer does not contract away his core function as ultimate fact-finder with regard to an employee's workplace performance." *Id.* at 86–87, 862 A.2d at 952. It concludes, "[t]o hold otherwise would be to put the courts in the position of making ... personnel decisions, acting as a super personnel officer, or of second-guessing a company's decisions." *Id.* at 86–87, 862 A.2d at 952, quoting *Elliott,* 104 Md.App. at 110, 655 A.2d at 54 (citation and quotations omitted). Moreover, the majority points out, its result is consistent with the result reached by the majority of the courts that have addressed the issue. *See Braun v. Alaska Commercial Fishing and Agriculture Bank,* 816 P.2d 140 (Alaska 1991); *Cotran v. Rollins Hudig Hall,* 17 Cal.4th 93, 69 Cal.Rptr.2d 900, 948 P.2d 412 (1998); *Southwest Gas Corp. v. Vargas,* 111 Nev. 1064, 901 P.2d 693 (1995); *Thompson v. Assoc. Potato Growers,* 610 N.W.2d 53 (N.D.2000); *Kestenbaum v. Pennzoil Co.,* 108 N.M. 20, 766 P.2d 280 (N.M.1988); *Simpson v. Western Graphics Corp.,* 293 Or. 96, 643 P.2d 1276 (1982); *Baldwin v. Sisters of Providence,* 112 Wash.2d 127, 769 P.2d 298 (1989); *Life Care, Inc. v. Dexter,* 65 P.3d 385 (Wy.2003); *Almada v. Allstate Ins. Co., Inc.,* 153 F.Supp.2d 1108 (D.Ariz.2000); *cf. Gaudio v. Griffin Health Services Corp.,* 249 Conn. 523, 733 A.2d 197, 208 n. 13 (1999).

At the outset, I can see little, if any, distinction between the test the majority enunciates for the review of "just cause"

---

**5.** It is well to repeat that this contract does expressly provide that the respondent could be discharged only for cause and, thus, I submit, does contain an express indication otherwise that the employer is contracting away his fact-finding function as to the quality of the employees' workplace performance. The rule that the majority espouses would be more palatable were the parties' contract to contain express language reserving to the University the right to determine whether there was "just cause" for discharge.

contracts and that applicable to satisfaction contracts. Although characterized as focusing on the review of the "objective motivation" of the employer, in the case of a "just cause" contract, within the majority's contemplation and as it explains, what is really to be determined is the objective good faith with which the employer acted and the consistency of those actions with those of a reasonable employer under similar circumstances. *Id.* at 85, 862 A.2d at 950–51. That determination is made by assessing whether the challenged termination "was based upon any arbitrary, capricious, or illegal reason, or based on facts not reasonably believed to be true by the employer," *id.* at 85, 862 A.2d at 950–51, *i.e.* whether the employer acted in good faith.

Notwithstanding its being characterized as being a subjective one, *Towson,* 384 Md. at 83–84, 862 A.2d at 950, this is the precise test that also applies in the case of a satisfaction contract. As the majority describes it, the employer's subjective motivation involves determining "whether the employer was genuinely or honestly dissatisfied with the employee's services or merely feigning dissatisfaction." *Id.* at 83–84, 862 A.2d at 950. Thus, the test in a satisfaction contract is whether, when the employee was terminated, the employer was acting in good faith. *Elliott,* 104 Md.App. at 108, 655 A.2d at 53 (1995).[6] Whether probative of the objective motivation of the employer or its subjective motivation, the decisive factor is the same; in the case of either kind of contract, it is the good faith with which the employer acted that counts and that defines the test.

I am not at all convinced that the "business judgment rule," treated, and relied upon, in *Sadler* and *Elliott* supports, lest

---

6. It seems clear to me that an employee's proof of the non-existence of the purported factual basis for his or her termination is quintessentially and a fortiori proof of bad faith and, therefore, the lack of good faith. Moreover, it is difficult to conceive of a better way to attack an employer's objective motivation than by demonstrating that the grounds on which it acted did not exist. By parity of reasoning, there is no better way for the jury to assess a party's subjective motivation.

more requires, the result the majority reaches in this case. To be sure, that rule counsels against, and, indeed, prohibits the courts from inappropriately interfering with the business judgment of a private business, thus limiting the court's role in reviewing the actions of that business. *See Sadler,* 378 Md. at 531, 836 A.2d at 668. But *Sadler* is clear: the business judgment rule "has never precluded full litigation of complaints sounding in tort or contract against the corporation. A corporation, as a private entity, may be held liable for tortious conduct and breaches of contracts, perpetrated by its officers, directors, and agents, against third parties.... Nothing in the jurisprudence of this State would hold otherwise." *Id.* at 532, 836 A.2d at 668–69, citing Maryland Code (1975, 1999 Repl. Vol., 2002 Supp.) § 2–103 of the Corporations and Associations Article. The petitioner entered the employment contract at issue in this case voluntarily. In return for the respondent's services, it agreed to limit its power to discharge the respondent, thus, however viewed, objectively or subjectively, intending to provide the respondent with greater job security. The business judgment rule does not, and should not, be construed to shield the petitioner, even partially, from its breach or to change, in the least, the bargain that the parties made.

Rather than the cases on which the majority relies, the majority view, I am persuaded, on both accounts, by the reasoning of *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980), and its progeny. *See Raymond v. IBM, Corp.,* 954 F.Supp. 744, 751–52 (D.Vt. 1997); *Schuessler v. Benchmark Marketing and Consulting, Inc.,* 243 Neb. 425, 500 N.W.2d 529, 538 (1993) ("If the employer produces sufficient evidence, the employee may rebut, and if in controversy, the issue goes to the trier of fact; however, the ultimate burden of proving wrongful termination remains with the employee"); *Alegria v. Idaho First Nat. Bank,* 111 Idaho 314, 723 P.2d 858, 875 (1986); *Sanders v. Parker Drilling Co.,* 911 F.2d 191 (9th Cir.1990). In *Toussaint,* the Michigan Supreme Court held that, like the determinations of whether there is an express agreement to discharge the employee only for cause and the compliance of that termination with the procedures governing it, "the question

whether termination of employment was in breach of the contract ... was also one for the jury." 292 N.W.2d at 895. The court was aware of, and took account of, the facts that the role of the jury may differ in each case,[7] *id.* at 896, and may present some significant issues, if not difficulties, *id.*, including the danger, when the issue is the sufficiency of the cause for termination, that the jury will substitute its judgment for that of the employer. *Id.* Nevertheless, after considering the good faith/reasonableness test and the option of instructing the jury consistent therewith and notwithstanding its recognition that "[w]hile the promise to terminate for cause includes the right to have the *employer's decision reviewed, it does not include a* right to be discharged only with the concurrence of the communal judgment of the jury," *id.*, the court rejected both the test and the instruction alternative. Noting that "[s]uch an instruction would transform a good-cause contract into a satisfaction contract," *id.*, it explained:

> "Where the employer has secured a promise not to be discharged except for cause, he has contracted for more than the employer's promise to act in good faith or not to be unreasonable. An instruction which permits the jury to review only for reasonableness inadequately enforces that promise."

*Id.*

Moreover, rejecting the notion that there is an identity between satisfaction contracts and "just cause" contracts, the

---

7. The court in *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (1980) observed:

> "Where the employer claims that the employee was discharged for specific misconduct intoxication, dishonesty, insubordination and the employee claims that he did not commit the misconduct alleged, the question is one of fact for the jury: did the employee do what the employer said he did? ...
>
> "Where the employer alleges that the employee was discharged for one reason excessive tardiness and the employee presents evidence that he was really discharged for another reason because he was making too much money in commissions the question also is one of fact for the jury.... The jury is always permitted to determine the employer's true reason for discharging the employee."

*Id.* at 896 (footnotes omitted).

court concluded, "[a] promise to terminate employment for cause only would be illusory if the employer were permitted to be the sole judge and final arbiter of the discharge. There must be some review of the employer's decision if the cause contract is to be distinguished from the satisfaction contract." *Id.* at 895. To the expressed fear that enforcing cause only discharges will lead to employee incompetence and inefficiency, *id.* at 896, the court responded, "no employer is obliged to enter into such a contract." *Id.* at 896–97.

The cases on which the majority relies, and therefore the basis on which the majority has decided this case, proceed on a premise that is antithetical to the ordinary rules of contract construction,[8] that a contract that is clear and unambiguous with respect to the rights and obligations of the parties may be construed so as to relieve one party of the obligations it undertook and to redefine the rights the other contracted to receive. The majority also adopts "a legal presumption that the employer retain[s] the fact-finding prerogative underlying the decision to terminate employment." [9] *Towson,* 384 Md. at

---

8. It is well settled that contracts are construed in accordance with, and governed by, the canons of statutory construction. *See Walker v. Department of Human Resources,* 379 Md. 407, 421, 842 A.2d 53, 61 (2004). One of them, and a most important one, is that the parties' intention is to be gleaned from the words of the contract, and when they are unambigious, no construction or interpretation is necessary or permitted. *Id.*

9. A legal presumption is necessary given the majority's assumption, as the petitioner argued, that the contract language is ambiguous and does not speak one way or the other to the issue of the fact-finding prerogative. *Towson,* 384 at 80, 862 A.2d at 948.

Although the majority did not resolve the conflicting arguments of the parties as to the real meaning and effect of Paragraph 6.2, it does suggest the possibility that the paragraph, because "a hearing would accomplish nothing that would not be accomplished in court before a jury," would be superfluous except as a means of reserving to the employer the fact-finding prerogative. Id. at 81, 862 A.2d at 948. I can think of a reason for Paragraph 6.2 that has absolutely nothing to do with the fact-finding prerogative. It is a timing provision; the date of the hearing, or of the decision following the hearing, or the date of expiration of the time for requesting a hearing, triggers when the termination takes effect. Indeed, that is precisely what the Paragraph provides, however inartfully the majority may think it is. This also

89, 862 A.2d at 953. This is required, the majority submits, due to "the practical considerations of running a business," "employers often 'rely on hearsay, on past similar conduct, on their personal knowledge of people's credibility, and on factors that the judicial process ignores,' indicating that '[w]hat works best in a judicial proceeding may not be appropriate in the employment context,'" and, in any event, the petitioner in this case "alone was in the best position to determine whether there were facts sufficient to constitute 'incompetence' and 'wilful neglect of duties.'" *Id.* at 89, 862 A.2d at 953, quoting *Waters v. Churchill*, 511 U.S. 661, 676, 114 S.Ct. 1878, 1888, 128 L.Ed.2d 686, 700 (1994). This rule is given context and meaning by reference to the business judgment rule and the majority's interpretation of that rule as a non-interference rule for all purposes. Surely, the majority does not advocate that one party to the contract should be its sole and final arbiter in the absence of such an agreement.

The well settled rule of contract construction is, of course, to the contrary. It is that, where the words of the contract are clear and unambiguous, no interpretation is required or permitted, *see Wells v. Chevy Chase Bank, FSB*, 363 Md. 232, 250–251, 768 A.2d 620, 630 (2001); effect is to be given to the contract as written. *See Walker v. Department of Human Resources*, 379 Md. 407, 421, 842 A.2d 53, 61 (2004). Even when the contract terms are ambiguous, we seek the intention of the parties, which may be supplied by parol evidence or from other extraneous sources. *Beale v. American Nat'l Lawyers Ins. Reciprocal*, 379 Md. 643, 658, 843 A.2d 78, 87 (2004). I am simply unaware that, in contract cases, even those involving a business entity, the parties' intention can be determined by means of a legal presumption.

---

answers Judge Eldridge's point with respect to the governmental immunity issue, which is dependent on the timeliness of the contract action filed by the respondent. In this case, the President's letter denying the respondent relief specifically states the date of the respondent's termination and that date is less than one year prior to the filing of the respondent's contract action.

In any event, there is nothing in the contract that suggests, much less establishes, that the parties intended that the fact-finding as to the termination decision be made solely by the employer. Certainly, in the absence of an express provision to that effect, such an interpretation is inconsistent with the employee's intent, as evidenced by his having successfully negotiated for a "just cause" only termination. Extracting such a promise is inconsistent with an intent on the part of the employee to give his or her employer the degree of control, or even close to that degree of control, that the employer retains when it enters into an at will or a satisfaction contract. A "just cause" contract is, as the majority admits, significantly different from, and provides an employee with significantly greater protection than, those other two kinds of contract. *Towson*, 384 Md. at 84, 862 A.2d at 950. Rather than simply paying lip service to the distinction, the petitioner's promise should be reflected in the interpretation given the contractual relationship.

And the use of a legal presumption is not the appropriate way to resolve an ambiguity; as I have pointed out, and this Court has repeatedly held, *see Sy–Lene of Washington Inc., v. Starwood Urban Retail II*, 376 Md. 157, 167–68, 829 A.2d 540, 547 (2003); *Langston v. Langston*, 366 Md. 490, 506–507, 784 A.2d 1086, 1095 (2001); *Wells* 363 Md. at 250–51, 768 A.2d 620, ambiguity triggers a search for the parties' intention, in the pursuit of which a court must consider, *inter alia*, parol or extrinsic evidence, the literal or usual meaning of the words used, the meaning of the words in light of the statute as a whole and within the context of the objectives and purposes of the enactment. *See Marriott Employees Fed. Credit Union*, *supra*, 346 Md. 437, 445, 697 A.2d 455, 459 (1997) (citing *Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1 (1995)); *Sy–Lene*, 376 Md. at 167–68, 829 A.2d at 547; *Langston*, 366 Md. at 506, 784 A.2d at 1095. Even if an ambiguity may be resolved by use of a legal presumption, the question still remains, why should the presumption favor the employer and not the employee? Indeed, logically, because the employer is not required to enter into "just cause" contracts and may, as it often

does, retain considerable authority to discharge its employees, the ambiguity should be construed against the employer, at least in the absence of evidence, by parol or otherwise, that both parties intended the employer to have the fact-finding responsibility and that the court or jury defer to the employer's exercise of that responsibility. The failure of the employer to negotiate a provision that clearly so provides is, I believe, proof positive that the parties did not intend what the majority imposes as a default.

The only basis on which the majority can justify the legal presumption it applies to hold in favor of the petitioner is by reference to the business judgment rule. But, as I have demonstrated, while the business judgment rule may preclude a court from substituting its judgment for that of the business whose judgment is at the core of a case, it was never intended to prevent the business from entering into contracts with such terms as the business desires nor to impact, one way or the other, the bargain that the business and the other party or parties to the contract made. Stated differently, the business judgment rule does not, and should not, change the terms of a contract negotiated at arms length. That this is so is made clear by the fact that no business is required to contract away its ability to terminate its employees; it need not agree to a "just cause" contract.

To be sure, the majority's concern that permitting the jury to be the final arbiter of whether the termination was justified may put the employer in a difficult position is legitimate. It may very well, and that might well be the situation in this case. It should be borne in mind, however, as the concurring and dissenting Justice in *Cotran* pointed out, that "the difficulty of the employer's position is matched or exceeded by the plight of a falsely accused and wrongfully terminated employee who is denied all legal redress." 948 P.2d at 428 (Kennard, J, concurring and dissenting). It is, in short, well and good to be concerned about what is fair to the employer, but what is fair to the employee also should, and must, be considered as well, and as seriously. The rule the majority adopts, being very deferential to the business entity, places the employee in

at least as difficult a position as permitting a jury to review the employer's termination decision would place the employer. The difference between the two positions is that one gives effect to the contract terms, the bargain the parties made, while the other does not. Because both parties agreed to the contract terms, as written, the contract should be enforced, as written.

The majority's evident and expressed concern that the everyday reality of the workplace is respected and that the efficient conduct of business is protected is reminiscent of the concern expressed by the dissenting judge in *Sanders v. Parker Drilling Company*, 911 F.2d 191, *supra*. In that case, the issue was the propriety of the jury's review of the employer's decision to terminate some of its employees for smoking marijuana on the employer's oil rigs, in violation of company policy. *Id.* at 192. Consistent with the majority's holding in this case, the employer argued that the jury's responsibility in reviewing the decision should be limited to determining whether the decision "was based on a good faith belief that [the employees] smoked marijuana on the oil rigs, not whether the allegation was actually true." *Id.* at 193. The court rejected that argument, holding that the question was whether the employees actually smoked marijuana.

One judge took the contrary view. *Id.* at 204–218 (Kozinski, J., dissenting). He expressed concern that the more expansive role of the jury would have an adverse impact on the employer's obligation to provide a safe working environment and did not give sufficient deference to the employer's policies against the use of drugs in the workplace, opining, in part:

"Working on an oil rig is dangerous business. It requires total concentration, precise timing, a fair degree of coordination and a significant amount of speed. Rig accidents can have disastrous consequences, ranging from severed limbs and multiple deaths to massive despoliation of the environment. It goes without saying that drug abuse has no place on oil rigs and that a company operating oil rigs has the right—indeed, the obligation—to take decisive action when

it obtains reliable information that some of its employees may be abusing drugs while on duty.

"This is the unhappy tale of a company that did just that. Company officials reasonably believed that three employees had used drugs on the job, not once but repeatedly. Two eyewitnesses fingered the drug-using employees; the company pursued the matter promptly, but not precipitously, obtaining confirmation from yet a third eyewitness before discharging the violators. The personnel action was taken in a balanced, detached, professional manner, free from any hint of rancor or personal animosity. Had the company acted less decisively, it would have betrayed its responsibility to other employees and the environment we all share. Yet when all is said and done, the fingered employees walk off with a cool third of a million dollars, while the company is left to pick up the tab, pay its lawyers and scratch its head wondering what it could have done differently. It is a question we all might ponder as we contemplate the bitter lesson of this cockeyed morality tale."

*Id.* at 204–205. Responding, the court pointed out:

"The dissent sympathizes with Parker's obligation to provide a safe working environment for its employees. It cites strong policy arguments against the use of drugs as authority to alter Alaska's law. Judge Kozinski does not believe that the jury should have the prerogative to second-guess Parker's determination that plaintiffs smoked marijuana on the oil rigs. Although we share Judge Kozinski's concern for safety in the workplace, we respectfully do not believe that concern provides us a mandate to water down centuries of respect for the place of juries in our civil justice system. At this level of our system of jurisprudence—the appellate level—the issue we confront as judges is not whether the use of certain drugs and narcotics is a serious threat to our nation, which it is, or whether the use of marijuana is dangerous to workers on oil rigs, which it is, but whether the verdict of the jury is supported by the evidence presented. The war on drugs can be waged without turning our

back on the rightful function of juries in resolving factual disputes."

*Id.* at 195. This response is just as appropriate and applicable to the case *sub judice.* Respect for, and deference to, the business judgment rule may be, and should be, given in an appropriate case, when the employer's business judgment is at issue. It should not be used, and it was not intended, to emasculate, in cases of express contracts between businesses and individuals employees, "the rightful functions of juries in resolving factual disputes" or to render the end of the playing field allocated to the employees in such cases a steep and ever increasing incline.

Certainly, evidence as to the business judgments made and the rationale for them may well be admissible and the jury would have to be instructed appropriately in light of the evidence. This is not the same, however, as abdicating to the business itself, the final word as to the efficacy of that judgment and its determinative effect in the case in which those business judgments were applied. Just as important, holding the parties to the bargain they struck does not, in any way, undermine the business judgment rule. Indeed, it really enhances it; it is after all, the exercise of business judgment to enter into a contract with specific and enumerated terms. Having exercised its business judgment to negotiate a contract acceptable to it, in which it incorporated contract terms favorable to it, the business should not be allowed then to decide, in the guise of business judgment, whether and, if so, how, those terms acceptable, but not uniformly favorable, to it, but favorable to the employee, are to be interpreted and applied.

I dissent.

ELDRIDGE, J., dissenting.

The majority opinion, Chief Judge Bell's dissenting opinion, the courts below, and the parties, all treat this case as an appropriate common law breach of contract action which was timely filed. The majority takes the position that this "breach of contract" action is controlled by the so-called business

judgment rule, *i.e.*, "the strong judicial policy against interfering with the business judgment of *private* business entities." Opinion at 76, 862 A.2d at 945, emphasis added. This action, however, does not involve the business judgment of a *private* entity. The defendant Towson University is a state government entity. Conte's employment contract was a *public* contract with an agency of the State of Maryland.

The difference between private employment contracts and public employment contracts, terminable only for cause, has substantial ramifications. ·

First, if it were appropriate to treat this lawsuit as a common law breach of contract action, I believe that the lawsuit would be untimely under the one-year limitations period for breach of contract actions against state government agencies set forth in Maryland Code (1984, 1999 Repl.Vol.), § 12–202 of the State Government Article. Therefore, the suit would be barred by governmental immunity.

Second, I believe that it would be more appropriate to treat this action as a Maryland common law action for judicial review of a state government adjudicatory administrative proceeding, and to remand the matter to the agency for proper findings of fact and conclusions of law.

Finally, regardless of whether Conte is entitled to an administrative hearing with findings of fact and conclusions of law, or to a judicial breach of contract action, the "business judgment" rule applied by the majority has no application to a governmental employment relationship terminable only for cause. Under due process principles applicable to the state government, an employee in Conte's position is entitled to present his defenses and obtain a *de novo* determination either in an administrative hearing which complies with Maryland law or in court.

I.

If the majority, Chief Judge Bell, the courts below, and the parties were correct in treating this case as a common law breach of contract action, it was not filed within one year of the date on which the claim arose, as required by Maryland

Code (1984, 1999 Repl.Vol.), § 12–202 of the State Government Article. Therefore, the suit was barred by governmental immunity.

Although a private breach of contract action is subject to a three-year statute of limitations which may be waived by a failure to raise the issue, a breach of contract action against a state agency must be filed within one year. Furthermore, as recently reaffirmed by this Court in *State v. Sharafeldin*, 382 Md. 129, 140, 854 A.2d 1208, 1214 (2004), the one-year period for bringing a breach of contract action against a state government agency is *not* "a mere statute of limitations, waivable at will by State agencies or their respective attorneys." The Court in *Sharafeldin*, 382 Md. at 148, 854 A.2d at 1219, concluded that the enactment of §§ 12–201 and 12–202 of the State Government Article

"was intended as a conditional waiver of the State's sovereign immunity in contract actions, which was to be accomplished by precluding the State and its agencies from raising that defense if the action was founded on a written contract executed by an authorized official or employee and the action was brought within the one-year period. If the action was not brought within that period, however, it was 'barred.' The sovereign immunity that the State enjoyed remained in effect; it could not be waived by subordinate agencies or their attorneys, and thus the agencies were required by law to raise the defense. We hold, therefore, that § 12–202 is not a mere statute of limitations but sets forth a condition to the action itself. The waiver of the State's immunity vanishes at the end of the one-year period . . . ."

Because neither Towson University nor its attorneys may waive the issue of governmental or sovereign immunity by failing to raise it, this Court "must consider whether the doctrine of sovereign immunity is applicable in this case even though it was not previously raised by the parties." *Board v. John K. Ruff, Inc.*, 278 Md. 580, 583, 366 A.2d 360, 362 (1976).[1]

---

1. The parties in the courts below did raise the issue of the timeliness of Conte's claims for compensation in fiscal years 1997 and 1998, and the

After Conte refused to resign, Towson University, on November 20, 1998, notified Conte by letter that it had cause to terminate his employment and "that the University will proceed to terminate your University employment for cause." The November 20, 1998, letter went on to state that Conte was being "reliev[ed] of your responsibilities as RESI Director" and was being placed "on administrative leave, with full pay and benefits" until the termination became effective. Then, on December 10, 1998, a ten-page letter signed by the Provost of Towson University was hand-delivered to Conte, informing Conte that the University terminated his employment; the December 10th letter set forth "the reasons supporting your termination."

Conte requested a hearing before the President of Towson University, as provided for in the employment contract, and President Hoke L. Smith held the hearing on January 18, 1999. On January 21, 1999, President Smith notified Conte that he was terminated for the reasons set forth in the December 10, 1998, letter and that the termination was "effective the close of business January 26, 1999." President Smith's January 21st decision consisted of one short paragraph and contained no findings of fact or conclusions of law based upon evidence introduced or arguments made at the hearing.

The statutory time limit for filing a breach of contract action begins to run from the initial breach of the contract. *Jones v. Hyatt*, 356 Md. 639, 648–649, 741 A.2d 1099, 1104 (1999), and cases there cited. The complaint in the case at bar was filed in the Circuit Court on Monday, January 24, 2000.

If January 21, 1999, the date on which Conte was last notified of his termination, was the date on which his cause of action arose, the action was barred by the one year period set

Court of Special Appeals held that those claims were barred by § 12–202 of the State Government Article. Conte's cross-petition for a writ of certiorari challenging that holding was denied by the Court. It appears that no issue has previously been raised concerning the timeliness of Conte's entire action.

forth in § 12–202 of the State Government Article. The one-year period from January 21, 1999, expired either on Thursday, January 20, 2000, or at the latest, Friday, January 21, 2000. Obviously, if his breach of contract cause of action accrued earlier, on November 20, 1998, when Conte was first notified of the proposed termination *and was suspended,* or December 10, 1998, when he was again notified of his termination and given detailed reasons, the one-year period prescribed by § 12–202 had long expired. Conte's breach of contract suit was timely only if the one-year period under § 12–202 did not begin to run until his termination was effective and he was removed from the payroll on January 26, 1999.

The majority opinion baldly asserts, without citing any case-law or other authorities, and without any reasoning, that Conte's "cause of action for the actual breach" of his employment contract arose when the contract was "effectively terminated on January 26, 1999." Opinion at 96, 862 A.2d at 957. This assertion is erroneous and contrary to authority in this Court and elsewhere.

If there were a breach of the employment contract between Conte and Towson University, it is likely that the breach occurred on November 20, 1998, or December 10, 1998, when the University informed Conte that the contract was terminated and suspended Conte. A change in an employee's status, such as a suspension, has been held to constitute a breach of the employment contract even though the employee's pay is not terminated or changed. *See 9 Corbin On Contracts* § 958, at 752 (Interim Edition 2002). Furthermore, the fact that a plaintiff may have defenses to the defendant's action does not necessarily prevent the running of limitations. *Cf. Himelfarb v. American Express Company,* 301 Md. 698, 705, 484 A.2d 1013, 1016 (1984) ("From the standpoint of the Maryland common law of contracts, ... [the] claimed defense is ... ineffective to prevent accrual of [the plaintiff's] cause of action.... The limitations clock begins to tick while the [contracting party] is deciding whether an asserted defense is meritorious"). Consequently, the one year period under § 12–

202 probably started to run on November 20, 1998, or December 10, 1998, despite Conte's assertion of defenses at the January 18, 1999, hearing.

At any rate, the breach of contract had certainly occurred, and Conte's cause of action had clearly arisen, by January 21, 1999, when Conte for the third and final time was notified that the contract was terminated.

This Court has held that repudiation of an employment contract, even before the time for performance, "in our judgment, constituted a breach which gave an immediate right of action and entitled the plaintiff to recover damages," *Dugan v. Anderson*, 36 Md. 567, 585 (1872). The majority opinion implies that, for purposes of "injunctive relief," Conte's cause of action may have accrued when Conte was notified of the termination, but that for purposes of an "actual breach" of contract action, for money damages, Conte's cause of action accrued on the effective date of the termination, which was January 26, 1999. Majority opinion at 96, 862 A.2d at 957. This position is directly contrary to *Dugan v. Anderson*, *supra*, 36 Md. 567. The *Dugan* case was a breach of contract action at law, for money damages, in a court which had jurisdiction only in actions at law (the Superior Court of Baltimore City).[2]

In common law breach of employment contract actions, as well as statutory actions based upon wrongful breaches of employment contracts or wrongful terminations of employment, the general rule is that the running of limitations begins when notice of termination is issued by the employer and *not* when the termination becomes effective.

For example, in the leading case of *Chardon v. Fernandez*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), employees were notified prior to June 18, 1977, that their employment would terminate at effective dates between June 30 and August 8, 1977. One of these employees on June 19, 1978, brought an

---

**2.** Furthermore, because an action for an injunction is equitable, in such an action against a private employer, the statute of limitations would not ordinarily be directly applicable, and the timeliness issue would be governed by principles of laches.

action for unlawful employment termination pursuant to a statute which, like Maryland's § 12–202, had a one-year period of limitations. The United States Court of Appeals for the First Circuit, like the majority today, held that the limitations period did not begin running until the employment termination became effective and the employment actually ended, and that, therefore, the action was timely. The Supreme Court of the United States, however, reversed, holding that the limitations period began to run when the employee was notified of the termination. The Court explained that "[t]he fact that they [respondent and other employees] were afforded reasonable notice cannot extend the period within which suit must be filed." *Chardon v. Fernandez, supra,* 454 U.S. at 8, 102 S.Ct. at 29, 70 L.Ed.2d at 9.

Another leading Supreme Court case is *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), which was an action by a college professor based upon the alleged unlawful termination of his employment. The Supreme Court held that the statute of limitations began to run from the time the college professor was notified that he would be denied tenure and would be terminated, and not from the later date when the termination was effective.

Numerous cases, both federal and state, have relied upon the Supreme Court's *Chardon* and *Ricks* opinions, as persuasive authority, to hold that the statute of limitations, in an employee's action based upon termination of employment, begins to run from the time the employee received notice of the termination and not from a later date when the termination became effective or the employment actually ceased. *See, e.g., Cooper v. St. Cloud State University,* 226 F.3d 964, 965, 967 (8th Cir.2000) (Relying upon *Delaware State College v. Ricks, supra,* the United States Court of Appeals stated: "[W]e hold that the statute of limitations began to run when the college announced its official tenure decision, rather than at the time of termination"); *Holmes v. Texas A & M University,* 145 F.3d 681, 684–685 (5th Cir.1998) (Texas statute of limitations ran from the notice to the university professor that he would be terminated rather than from the later date when

the university re-affirmed its decision, with the United States Court of Appeals stating: "Although *Ricks* concerned the statute of limitations for filing a complaint with the EEOC rather than the Texas limitations period at issue here, we still consider the *Ricks* opinion persuasive on this point"); *Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 133–134 (5th Cir.), *cert denied*, 506 U.S. 845, 113 S.Ct. 136, 121 L.Ed.2d 89 (1992) (Employee's action under a state statute for allegedly improper termination); *Miller v. International Telephone and Telegraph Corp.*, 755 F.2d 20, 23 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.E.2d 122 (1985) (citing *Chardon v. Fernandez, supra*, and *Delaware State College v. Ricks, supra*, the court stated that the statute of limitations "starts running on the date when the employee receives a definite notice of the termination, not upon his discharge"); *Daniels v. Fesco Division of Cities Service Co.*, 733 F.2d 622, 623 (9th Cir.1984) ("[A]n employer's liability for wrongful discharge commences upon notice of the employee's termination even though the employee continues to serve the employer after receipt of such notice," citing *Delaware State College v. Ricks*, although the cause of action before the Ninth Circuit was under California law); *Eastin v. Entergy Corp.*, 865 So.2d 49, 54 (La.2004) ("[W]e adopt the *Ricks/Chardon* rule.... Consequently, in the instant case, the prescriptive period of one year began to run for each of the ... Plaintiffs on the dates each of them were notified of their respective terminations"); *Martin v. Special Resource Management, Inc.*, 246 Mont. 181, 185, 803 P.2d 1086, 1088–1089 (1990) (In an employee's breach of contract action, after discussing the *Chardon* and *Ricks* cases, the Montana Supreme Court agreed that the employee's "cause of action accrued upon notice of her termination," as "[a]ll the elements needed for a claim of breach ... were present then" and "[i]t is from the *decision* to terminate itself which Martin seeks redress") (emphasis in original); *Delgado Rodriguez v. De Ferrer Y Otros*, 121 P.R. Dec. 347, 357 (Supreme Court of Puerto Rico 1988) (The employee's "cause of action accrued on March 19, 1981, when he was notified of his removal. * * * The action was time-barred and should

have been dismissed," relying upon *Chardon v. Fernandez* ); *Webster v. Tennessee Board of Regents*, 902 S.W.2d 412, 414 (Tenn.App.1995) (A state university's Director of Finance and Accounting received notice on September 3, 1991, "that he would be terminated from his employment, effective 30 September 1991, the day on which his contract for services ended. Plaintiff continued to work until 30 September 1991." After discussing *Delaware State College v. Ricks*, the court held that limitations began to run on September 3, 1991, and that the action, filed on September 28, 1992, was barred by the one-year statute of limitations); *Yoonessi v. State University of New York*, 862 F.Supp. 1005, 1014 (W.D.N.Y.1994), *appeal denied*, 56 F.3d 10 (2d Cir.1995), *cert. denied*, 516 U.S. 1075, 116 S.Ct. 779, 133 L.Ed.2d 730 (1996) ("[T]he date the decision to terminate was made [is when] the limitations period begins to run ..., or on the date the employee was notified of the decision," citing *Chardon* and *Ricks* ); *Montalban v. Puerto Rico Marine Management, Inc.*, 774 F.Supp. 76, 77 (D.P.R. 1991) (Applies the principle of *Chardon* and *Delgado Rodriguez v. Nazario de Ferrer, supra*, "that all causes of actions for employment termination accrue" when the employee has notice or knowledge of the termination, and not from the later effective date).[3]

---

**3.** In *Oker v. Ameritech Corp.*, 89 Ohio St.3d 223, 729 N.E.2d 1177 (2000), the Supreme Court of Ohio, in an action under an Ohio statute relating to age discrimination, declined to apply the principle of *Delaware State College v. Ricks*. In holding that the period of limitations did not begin to run until the last day of employment, the Ohio Supreme Court did not disagree with the *Ricks* opinion. Instead, the court distinguished *Ricks* because of a provision in the Ohio statute expressly providing for liberal construction and because of other language in the Ohio statute.

The Supreme Court of Oregon, however, has disagreed with the rule set forth in *Ricks*, holding that, in a tort action based on wrongful discharge, limitations runs from the end of the employment relationship because the tortious discharge occurred on the last day of employment. *Stupek v. Wyle Laboratories*, 327 Or. 433, 439, 963 P.2d 678, 682 (1998). The position taken by the Oregon court is a distinct minority view. Moreover, the *Stupek* case is distinguishable from the case at bar, as it involved a tort action for abusive discharge. In an action for breach of an employment contract, Maryland law clearly appears to be in accord

Many other cases, although not specifically relying on *Chardon* or *Ricks,* have taken the same position. *See, e.g., Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1292 (9th Cir.1987) (Holding, in a diversity case governed by California law, that "[a]n 'employer's liability for wrongful discharge commences upon notice of the employee's termination even though the employee continues to serve the employer after receipt of such notice' "); *Johnston v. Farmers Alliance Mutual Insurance Company,* 218 Kan. 543, 548, 545 P.2d 312, 317 (1976) (An employee was notified of his termination on March 3, 1972, although he was paid through May 31, 1972, and the Supreme Court of Kansas, in holding that the action was time-barred, reasoned that "plaintiff sustained substantial injury upon receipt of official notice of termination on March 3, 1972, and his cause of action accrued on that date"); *Nicholson v. St. John the Baptist Parish School Board,* 707 So.2d 94, 95 (La.App.) *writ not considered,* 716 So.2d 879 (La.1998) ("The prescriptive period *begins* to run when the plaintiff has *actual* or *constructive notice* of the alleged wrongful termination") (italics in original); *Morgan v. Musselwhite,* 101 N.C.App. 390, 393, 399 S.E.2d 151, 153, *review denied,* 329 N.C. 498, 407 S.E.2d 536 (1991) ("By no later than the spring of 1987, plaintiff . . . knew [that] defendant no longer planned to employ him. It was at this time that his cause of action arose").

Moreover, even in situations where, after notice of termination, an employee is entitled to invoke contractual or other grievance procedures or administrative procedures to challenge the termination, the statute of limitations for an independent breach of contract, tort, or statutory action based upon the termination, begins to run from the time of notice and not from the decision under the grievance or administrative procedures. *See Holmes v. Texas A & M University, supra,* 145 F.3d at 685 ("Holmes deserves no equitable tolling for the pendency of his university grievance procedures");

---

with the *Ricks* and *Chardon* opinions. *See Dugan v. Anderson,* 36 Md. 567, 585 (1872).

*Walch v. University of Montana,* 260 Mont. 496, 498, 502, 861 P.2d 179, 180, 182 (1993) (After notice of termination, the plaintiff "filed a grievance contesting his discharge," but the Supreme Court of Montana held that limitations began running from the notice, stating "that a cause of action for wrongful termination from employment, whether it is based on breach of the covenant ... or a common law wrongful discharge claim, 'accrued upon notice of [the employee's] termination' "); *Zachary v. State of Oklahoma ex rel. The Department of Corrections,* 34 P.3d 1171, 1172–1173 (Okl.Civ.App. 2001) (Limitations began to run when the employee received his notice of termination and not when his administrative remedies were exhausted); *Yoonessi v. State University of New York, supra,* 862 F.Supp. at 1014 ("[T]he filing and pendency of his grievances with the union did not toll the ... period for filing"); *Montalban v. Puerto Rico Marine Management, Inc., supra,* 774 F.Supp. at 78.

If the present case is to be treated as a breach of contract action, it was untimely. Under these circumstances, the judgments below should be vacated and the case should be remanded to the Circuit Court with directions to dismiss the action on the ground of governmental immunity. This Court has no occasion to reach the questions dealt with in the majority's opinion and Chief Judge Bell's dissenting opinion.

## II.

Towson University's status as an agency in the Executive Branch of the State Government, and Conte's status as a government employee who could only be terminated for cause, coupled with the express contractual provision for a hearing before the head of the agency, *i.e.,* the President of Towson University, necessarily presents the issue of whether a common law breach of contract action in the Circuit Court is an appropriate proceeding for resolving this dispute.

An employee in the Executive Branch of the State Government, who can only be disciplined or terminated for cause, is, as a matter of constitutional due process, entitled to a hearing

at which the employee is given the opportunity to refute the charges against him or present defenses. *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977); *Maryland Classified Employees Association v. State of Maryland*, 346 Md. 1, 22, 694 A.2d 937, 947 (1997); *De Bleecker v. Montgomery County*, 292 Md. 498, 513 n. 4, 438 A.2d 1348, 1356 n. 4 (1982). Such a hearing is normally an adjudicatory administrative hearing in the Executive Branch of government, subject to a statutory or common law judicial review action in a Maryland Circuit Court. *See Brukiewa v. Police Comm'r*, 257 Md. 36, 42, 263 A.2d 210, 213 (1970).

The majority opinion seems to suggest that a common law breach of contract action is a "remedy available" to an employee for purposes of defending against the charges brought by the state agency. Opinion at 96, 862 A.2d at 957. Although perhaps due process requirements could be satisfied by a *de novo* breach of contract action in a court at which the terminated employee would have an opportunity to refute the charges or offer defenses, such a proceeding involving a *government* employee would be highly unusual. Moreover, in *Maryland Classified Employees Association v. State of Maryland, supra,* 346 Md. at 22, 694 A.2d at 947, Judge Wilner for this Court took the position that the hearing must ordinarily be "pre-termination," saying:

"[W]hen the attributes attendant to public employment under State law are such as to give the employee 'a legitimate claim of entitlement' to the position, as under a tenure plan or where dismissal may only be for cause, a property interest in that employment is created, and the right to *procedural* due process ordinarily requires the opportunity of a pre-termination hearing." [4]

---

4. The majority intimates that my position is that an administrative/judicial review proceeding "is a jurisdictional requirement." Opinion at 96, 862 A.2d at 957. That is *not* my position. Exhaustion of a required administrative/judicial review remedy is ordinarily *not* a "jurisdictional" matter or a "jurisdictional requirement" under Maryland law. *Board of Education for Dorchester Co. v. Hubbard,* 305 Md. 774, 787,

Furthermore, the majority opinion in the present case, by treating Towson University as a private entity, applies a rule precluding the court in the breach of contract action from reviewing the factual basis of the termination, even under a "substantial evidence" standard. If a circuit court breach of contract action could provide the due process hearing for a governmental employee, the type of court action outlined by the majority opinion clearly does not provide due process. It does not give the employee any right to refute the charges or present defenses in a circuit court. The Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights are not applicable to private employment relationships. Towson University, however, is restrained by both constitutional provisions.

Considerations of due process, plus the express provisions of the employment contract, certainly appear to require an administrative hearing before the head of an agency within the Executive Branch of Maryland Government, *i.e.*, the President of Towson University. In fact, the majority's deference to the governmental "factfinder" confirms that the majority, although unwittingly, is actually treating the proceedings culminating in Conte's termination as governmental administrative adjudicatory proceedings.

In its insistence that this case should properly be treated as a common law breach of contract action, the majority relies on Maryland Code (1978, 2004 Repl.Vol.), § 12–104(j)(2) of the Education Article, which provides as follows:

"(2) Except with respect to grievance appeals under Title 13, Subtitle 2 of this article, Title 10, Subtitles 1 and 2 of the

---

506 A.2d 625, 631 (1986) (Failure to invoke and exhaust a primary administrative/judicial review "remedy does not ordinarily result in a trial court's being deprived of fundamental jurisdiction," per Eldridge, J., for the Court). *See also, e.g., State Retirement v. Thompson,* 368 Md. 53, 66, 792 A.2d 277, 284–285 (2002); *Montgomery County v. Ward,* 331 Md. 521, 526 n. 6, 629 A.2d 619, 621 n. 6 (1993). In the case at bar, the Circuit Court clearly had subject matter jurisdiction over Conte's breach of contract action. The issues concern how that jurisdiction should have been exercised.

State Government Article ('Administrative Procedure Act') are not applicable to the University."

Title 13, Subtitle 2, of the Article deals with classified employees of the University System of Maryland. Consequently, termination proceedings with regard to classified employees of Towson University are subject to the Administrative Procedure Act, and termination proceedings concerning non-classified employees, including Conte, are exempt from the Administrative Procedure Act.

The fact that the termination proceedings here are exempt from the Administrative Procedure Act furnishes no reason to conclude that a common law breach of contract action is appropriate. Numerous types of adjudicatory administrative proceedings are exempt from the Administrative Procedure Act, but such exemption does not change the inherent nature of such proceedings or convert them into common law breach of contract actions. *See, e.g.*, Code (1984, 1999 Repl.Vol.), §§ 10–102(b) and 10–203 of the State Government Article, containing lists of administrative agencies or proceedings exempt from the Administrative Procedure Act.

An exemption from the Administrative Procedure Act or other administrative law statute simply means that the administrative proceeding is governed by Maryland common law administrative law principles and that judicial review in a circuit court takes the form of mandamus, certiorari, declaratory judgment, or equitable proceedings. It also means that the 30–day period of limitations set forth in Maryland Rule 7–203 is inapplicable. *See* Rule 7–201(a). The standards, however, are essentially the same regardless of whether the administrative/judicial review proceedings are pursuant to statute or are governed by Maryland common law administrative law principles. *See, e.g., Board of License Commissioners for Anne Arundel County v. Corridor Wine, Inc.*, 361 Md. 403, 411–412, 761 A.2d 916, 920 (2000); *Bucktail v. County Council of Talbot County*, 352 Md. 530, 542–552, 723 A.2d 440, 446–450 (1999); *State v. Board of Education*, 346 Md. 633, 642–644, 697 A.2d 1334, 1338–1339 (1997); *Goodwich v. Nolan*, 343 Md. 130, 146, 680 A.2d 1040, 1048 (1996); *Medical Waste*

*v. Maryland Waste,* 327 Md. 596, 610–611, 612 A.2d 241, 248 (1992); *Silverman v. Maryland Deposit,* 317 Md. 306, 324–326, 563 A.2d 402, 411–412 (1989); *Criminal Inj. Comp. Bd. v. Gould,* 273 Md. 486, 501–507, 331 A.2d 55, 65–68 (1975), and cases there cited.

In fact, the General Assembly's express exemption of all University System of Maryland proceedings from the Administrative Procedure Act, except those involving classified employees, could hardly be a determination that no such proceedings are by nature adjudicatory administrative proceedings and that all disputes should be resolved by common law contract or tort actions in the courts. Obviously, numerous types of adjudicatory administrative proceedings take place in the University System. *See, e.g., Frankel v. Board of Regents,* 361 Md. 298, 308, 761 A.2d 324, 329 (2000). An exemption from the Administrative Procedure Act clearly does not reflect a legislative intention that governmental employment termination disputes should be treated as breach of contract actions. The General Assembly exempts *administrative proceedings* from the Administrative Procedure Act. It does not, to the best of my knowledge, enact statutes exempting common law breach of contract actions from the Administrative Procedure Act.

It would seem that the Towson University proceedings leading up to Conte's termination should be regarded as adjudicatory administrative proceedings subject to normal judicial review for substantial evidence underlying factual findings, arbitrariness, legal error, etc.[5] Under our cases, primary jurisdiction should be accorded to such administrative/judicial review proceedings, and exhaustion of the administrative/judicial review remedy is required. *See, e.g.,*

---

5. In fact, using a breach of contract action instead of a "substantial evidence" judicial review action, to review an adjudicatory administrative proceeding and decision by the Executive Branch of the State Government, may well present serious Maryland constitutional problems under the principles set forth in *Department of Natural Resources v. Linchester Sand and Gravel Corporation,* 274 Md. 211, 222–229, 334 A.2d 514, 522–526 (1975), and its progeny.

*Fosler v. Panoramic Design, Ltd.,* 376 Md. 118, 133–138, 829 A.2d 271, 280–283 (2003); *Dorsey v. Bethel A.M.E. Church,* 375 Md. 59, 76, 825 A.2d 388, 397–398 (2003); *Furnitureland v. Comptroller,* 364 Md. 126, 133, 771 A.2d 1061, 1065 (2001); *Josephson v. Annapolis,* 353 Md. 667, 674–678, 728 A.2d 690, 693–695 (1998); *Holiday v. Anne Arundel,* 349 Md. 190, 201, 707 A.2d 829, 834–835 (1998); *Zappone v. Liberty Life Insurance,* 349 Md. 45, 60–66, 706 A.2d 1060, 1067–1070 (1998).

Like governmental immunity, public policy considerations mandate that issues of primary jurisdiction, exhaustion of administrative remedies, and the propriety of bringing an action other than a judicial review action, "are issues which this Court will address *sua sponte.*" *Furnitureland v. Comptroller, supra,* 364 Md. at 132, 771 A.2d at 1065. *See, e.g., Montgomery County v. Broadcast Equities,* 360 Md. 438, 451 n. 7, 758 A.2d 995, 1002 n. 7 (2000); *Maryland Reclamation v. Harford County,* 342 Md. 476, 490 n. 10, 677 A.2d 567, 574 n. 10 (1996); *Montgomery County v. Ward,* 331 Md. 521, 526 n. 6, 629 A.2d 619, 621 n. 6 (1993); *Moats v. City of Hagerstown,* 324 Md. 519, 525–526, 597 A.2d 972, 975 (1991); *Board of Education for Dorchester Co. v. Hubbard,* 305 Md. 774, 787, 506 A.2d 625, 631 (1986).

If, as I believe, the appropriate circuit court action in this case was not a breach of contract suit but was a common law action for "substantial evidence" judicial review under the principles set forth in *Bucktail v. Talbot County, supra,* 352 Md. at 549–552, 723 A.2d at 448–450, and similar cases, this Court could in its discretion take any one of three different approaches. Since Conte failed to bring a judicial review action, and improperly sued for breach of contract, the Court could simply vacate the judgments below and direct that the breach of contract suit be dismissed. *See Holiday v. Anne Arundel, supra,* 349 Md. at 202–204, 214, 707 A.2d at 835–836, 841 (After a final administrative decision, the aggrieved party pursued a declaratory judgment action instead of a judicial review action, and this Court vacated the judgments below and directed the Circuit Court to dismiss the action). Or, the Court could vacate the judgments below, direct that Conte be

allowed to amend his complaint to assert the proper type of action, and, if he so amends, direct the Circuit Court to perform a traditional judicial review function. Lastly, because the function of a trial court and an appellate court are the same in an action for judicial review of an adjudicatory administrative decision, this Court could treat Conte's complaint as an action for judicial review and proceed to review the final administrative decision by the President of Towson University. *See Holiday v. Anne Arundel, supra,* 349 Md. at 204–214, 707 A.2d at 836–841 (This Court, as an alternative ground of decision, treated the improper declaratory judgment action as a judicial review action, reviewed the administrative decision, and took the position that the administrative decision should be upheld).

In the interests of justice, I would prefer this third alternative. Furthermore, I would direct that the administrative decision be vacated and that the case be remanded for findings of fact and conclusions of law. The short one-paragraph opinion of President Smith after the January 18, 1999, hearing, contains no findings of fact or conclusions of law. It fails to deal with any evidence or arguments that may have been advanced at the January 18th administrative hearing. Thus, in *Bucktail v. Talbot County, supra,* 352 Md. at 552–553, 723 A.2d at 450–451, a non-statutory judicial review action, the Court in an opinion by Judge Rodowsky summarized the applicable Maryland administrative law as follows:

"Logically, the next step in our analysis would be to determine if the facts found by the Council are supported by substantial evidence. The difficulty here, however, is that the Council's 'findings' are insufficient to permit judicial review.

" 'The court's task on review is *not* to substitute its judgment for the expertise of those persons who constitute the administrative agency[.]' " A reviewing "Court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." A court's role is limited to determining if there is substantial evidence in the record as a whole to support

the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.

*United Parcel Serv., Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 576–77, 650 A.2d 226, 230 (1994) (citations omitted). *Accord Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 505, 588 A.2d 772, 778 (1991) ("[A] fundamental right of a party to a proceeding before an administrative agency [is] to be apprised of the facts relied upon by the agency in reaching its decision and to permit meaningful judicial review of those findings. In a judicial review of administrative action the court may only uphold the agency order if it is sustained by the agency's findings and for the reasons stated by the agency."); *United Steelworkers of America AFL–CIO, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62, 69 (1984) (same).

"In accordance with the above standard of judicial review, in order for the reviewing court to determine whether the Council's action was fairly debatable, findings of fact are required.

"Findings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions."

*See also, e.g., Turner v. Hammond,* 270 Md. 41, 56, 310 A.2d 543, 551 (1973) (The agency "made no findings of fact worthy of the name"); *Rodriguez v. Prince George's County,* 79 Md.App. 537, 550, 558 A.2d 742, 748, *cert. denied,* 317 Md. 641, 566 A.2d 101 (1989) (Where Judge Wilner for the court stated: "It is not permissible for . . . any administrative body, simply to parrot general statutory requirements or rest on broad conclusory statements. * * * We have quoted in full the 'determinations' . . . that the [agency] adopted as its findings and conclusions. They do not suffice—they do not even begin to suffice—as 'specific written findings of basic facts and conclusions' ").

Nevertheless, regardless of the nature of the Towson University termination proceedings or the appropriate type of

court action, there is one thing about this case which is clear. The "business judgment" rule applied by the majority has no application to a governmental employment relationship which can only be terminated for cause. Conte is entitled to and should receive either a proper administrative proceeding which complies with Maryland law or a *de novo* breach of contract trial at which his defenses to the charges should be considered and ruled upon. The majority gives him neither.