**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 22-1403

---

METROPOLITAN DEVELOPMENT GROUP AT COOL SPRING, LLC, a
Virginia limited liability company,

Plaintiff - Appellant,

v.

COOL SPRING ROAD, LLC, a Maryland limited liability company; LIBBY
ADELPHI ROAD LLC, a Maryland limited liability company; LL COLLEGE
PARK LLC, a Maryland limited liability company; REBECCA B. SWANSTON, a
Maryland resident; CHARLES B. BOSWELL, a Maryland resident,

Defendants - Appellees.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
George Jarrod Hazel, District Judge.  (8:20-cv-03237-GJH)

---

Argued:  October 26, 2023                    Decided:  December 15, 2023

---

Before NIEMEYER, QUATTLEBAUM, and RUSHING, Circuit Judges.

---

Affirmed by unpublished per curiam opinion, from which Judge Quattlebaum wrote a
dissenting opinion.

---

**ARGUED:**  Nicholas M. DePalma, VENABLE LLP, Tysons, Virginia, for Appellant.
Steven A. Allen, PESSIN KATZ LAW, P.A., Towson, Maryland, for Appellees.  **ON
BRIEF:**  Henry F. Brandenstein, Jr., Caleb E. McCallum, Tysons Corner, Virginia,
Ashleigh J.F. Lynn, VENABLE LLP, Baltimore, Maryland, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case involves the interpretation of a "Joint Venture Formation Agreement" (the "Agreement") between Metropolitan Development Group at Cool Spring, LLC, a Virginia limited liability company, and Cool Spring Road, LLC, a Maryland limited liability company, for the development of 17.3 acres of land in Hyattsville, Maryland. Metropolitan, a developer, approached Cool Spring, the property owner, with the proposal to construct at least 120 market-rate multifamily rental units, and the two reached an agreement to form a joint venture when Metropolitan's proposed development had reached a specified stage. At such time, Metropolitan would be made a member of the Cool Spring limited liability company and thus would become a co-owner of the property. The Agreement gave Metropolitan up to three years to reach the specified stage and the right to terminate the Agreement if it did not believe it could or if it would be too onerous to do so.

When, after three years, Metropolitan was unable to obtain the requisite "Land Use Approvals" from government officials for its proposed development, Cool Spring notified Metropolitan that the Agreement, by its terms, "terminate[d]" because such Approvals were a condition precedent to consummation of the joint venture. Metropolitan then commenced this action, claiming that Cool Spring breached the Agreement, and Cool Spring filed a counterclaim seeking a declaratory judgment with respect to the parties' rights under the Agreement. The district court, on cross motions for summary judgment, granted judgment to Cool Spring, holding that Metropolitan's obtainment of the "Land Use Approvals" was a condition precedent to the formation of the joint venture and

2

Metropolitan's entitlement to be given co-ownership of the property. Metropolitan filed this appeal.

The core issue presented on this appeal is whether the Agreement required Metropolitan *to actually obtain* the Land Use Approvals before it could become a co-owner of the 17.3-acre property. Metropolitan contends that it was not required to obtain the Approvals but only to "use its *commercially reasonable efforts* to pursue and obtain" the Approvals, quoting from Paragraph 3.3(a) of the Agreement. The provision on which Metropolitan relies provides more fully:

> The parties agree that, from and after the Effective Date, Metropolitan shall have the right to pursue and obtain the Land Use Approvals and *shall use its commercially reasonable efforts to pursue and obtain* the Land Use Approvals.

(Emphasis added). Cool Spring argues, however, that the contractual language relied on by Metropolitan should be read to require Metropolitan both (1) to use commercially reasonable efforts to pursue the approvals *and* (2) to actually obtain them. It maintains that since Metropolitan did not obtain the Approvals within the time specified in the Agreement, Cool Spring was entitled to end the arrangement. We agree.

Focusing first on the language from Paragraph 3.3(a) relied on by Metropolitan and applying fundamental rules of contract interpretation, we note that if the language means what Metropolitan argues — that "commercially reasonable efforts" modifies both "pursue" and "obtain" — it raises the interpretational problem of superfluity by rendering either "pursue" or "obtain" superfluous because the "commercial reasonable efforts" necessary *to pursue* the Approvals are the same as those necessary *to obtain* them.

3

Consequently, it would be redundant to use both. Indeed, Metropolitan curiously acknowledges this in arguing, "If we drop the word 'pursue,' *then the obligation remains*: 'use commercially reasonable efforts to obtain approvals.' That still requires reasonable efforts to obtain the approvals — not a particular outcome." (Emphasis added). But by maintaining that position, Metropolitan would be violating the established principle of contract interpretation that "courts do not interpret contracts in a manner that would render provisions superfluous or as having no effect." *Towson University v. Conte*, 862 A.2d 941, 948 (Md. 2004). Thus, the reading of the Agreement that avoids violating this principle and gives meaning to all of its words is the one that requires Metropolitan both to use commercially reasonable efforts to pursue Approvals *and* also to obtain them.

Even more importantly, however, a reading that makes *obtaining* Approvals a condition of the Agreement is the only one that is consistent with the Agreement taken as a whole.

*First*, the Agreement was entered into to *develop* the property, not to sell an interest in it to Metropolitan without development. As the district court noted, Metropolitan, a developer, approached Cool Spring for the purpose of developing it, and Cool Spring agreed. Thus, the Agreement begins with a recital, "[Cool Spring] and Metropolitan desire to enter into a joint venture *to develop* the Project (hereinafter defined)." (Emphasis added). The Agreement then defines "Project" as "*Metropolitan's intended development* of the Property," which was to include at least 120 rental units. (Emphasis added). Without Land Use Approvals, the obtaining of which the Agreement assigned to Metropolitan, the Property could not be developed, and the stated purpose of the entire project would be

4

frustrated.  Obtaining Land Use Approvals was thus essential, which supports that it was a condition precedent.

*Second*, the Agreement specifies that Metropolitan had to seek the Land Use Approvals during a two-year "Entitlement Period," and if it did not *obtain them* within that two-year period, it was entitled to two extensions of six months each.  Addressing this, Paragraph 3.4 of the Agreement provides:

> *If Metropolitan is not successful in obtaining the Land Use Approvals* during the Entitlement Period, but Metropolitan has applied for and is diligently pursuing the Land Use Approvals, then Metropolitan shall have two (2) options to extend the Entitlement Period for periods of six (6) months each.

(Emphasis added).  Not only does this provision clearly describe the fundamental condition that Land Use Approvals *be obtained*, it also adds clarity to Metropolitan's obligation set forth in Paragraph 3.3(a), relied on by Metropolitan, to *both* use reasonable efforts to obtain the Approvals and to actually obtain them.

*Third*, the Agreement requires that the Land Use Approvals be *obtained* before allowing any member of the Cool Spring limited liability company to sell his or her individual interest, a privilege which necessarily had to occur at the time of the closing of the joint venture, as that was when Cool Spring would give Metropolitan an ownership interest.  Section 3.6(a) thus provides:

> *If Metropolitan successfully obtains the Land Use Approvals during the Entitlement Period* (including any extensions thereof), it shall notify [Cool Spring] of such fact.  Promptly thereafter, the [Cool Spring members] and Metropolitan shall meet and determine which of the [Cool Spring members] wish to continue with the construction of the Project, [and which, of various options, they elect if they choose to sell their interests].

The sequence established by Paragraph 3.6(a) of the Agreement thus is (1) that Metropolitan *obtain* the Land Use Approvals, (2) that Cool Spring members then be given the right to opt out of the Project, and (3) that thereafter Metropolitan be given an ownership interest at closing. Thus, the first essential condition, as stated in Paragraph 3.6(a), is that Metropolitan "successfully obtain[] the Land Use Approvals during the Entitlement Period."

And *fourth*, the Agreement authorizes Metropolitan, even before the Entitlement Period begins, to record its potential ownership interest in the property in the land records. And coupled with that privilege is the requirement that Metropolitan release that recording should Metropolitan *not obtain* the Land Use Approvals. Paragraph 2.3 provides:

> Following the expiration of the study period [which precedes the Entitlement Period], Metropolitan may elect to record a memorandum of option in the land records against the Property, memorializing its rights under this Agreement. If Metropolitan records such a memorandum, then [Cool Spring] shall promptly execute and acknowledge the same, and Metropolitan shall deliver an executed release of such option to the Escrow Agent, which release shall be recorded *if Metropolitan fails to obtain the Approvals during the Entitlement Period*.

(Emphasis added).

None of these provisions have meaning if Metropolitan were only required to make reasonable commercial efforts to obtain the Land Use Approvals. Indeed, they state that the failure to obtain Approvals would preclude further steps required by the Agreement. Thus, the Agreement clearly and unambiguously establishes that Metropolitan must obtain — not make efforts to obtain — the Land Use Approvals as a condition to the formation of the joint venture.

6

Quite apart from the linguistic difficulties with respect to Metropolitan's posited interpretation and the interpretation's inconsistency with numerous other provisions of the Agreement, Metropolitan's interpretation would undermine the entire purpose of the Agreement and thus ignore common sense. The Agreement was structured such that the joint development effort would continue only when certain gating items to the development of the property were fulfilled. Most fundamental was the need to obtain the necessary Land Use Approvals. By ignoring that condition, Metropolitan's interpretation makes little sense in light of the whole purpose of the Agreement — to develop the property. Moreover, and troublingly, Metropolitan seeks the benefits of such a development, which includes its acquiring co-ownership of the property, without providing the development that it had proposed. Thus, we can and do also rely on this common sense. *See Credible Behavior Health Inc. v. Johnson*, 220 A.3d 303, 313 (Md. 2019) ("As a bedrock principle of contract interpretation, Maryland courts consistently strive to interpret contracts in accordance with common sense" (internal quotations omitted)).

At bottom, we agree with the district court that obtaining the Land Use Approvals was a condition precedent to closing the joint venture and that Metropolitan's failure to obtain them within the specified Entitlement Period entitled Cool Spring to refuse to admit Metropolitan as a member of the joint venture. Accordingly, we affirm.

AFFIRMED

7

QUATTLEBAUM, Circuit Judge, dissenting:

Parties, especially sophisticated ones, should be able to count on courts to enforce the terms of their written agreements. But rather than doing that, the majority re-writes the Joint Venture Formation Agreement between Cool Spring, LLC, the owners of roughly 17 acres in Maryland, and Metropolitan Development Group. When the dust of that re-write settles, Metropolitan will be left without the benefit of a right it bargained for—the right to continue its efforts to develop the property to hopefully make a profit. Because the majority's decision strays from the express terms Metropolitan and Cool Spring agreed to, I respectfully dissent.

## I.

In the agreement, Cool Spring and Metropolitan said that they wanted to jointly develop apartments on the property. The agreement did not actually form a joint venture. Instead, it established rights and obligations that allowed for the possibility of Metropolitan becoming the majority owner in Cool Spring. Among other things, the agreement contemplated that before the property could be developed, as is often the case, local government officials had to issue certain land use approvals. And as it turns out, at least so far, no land use approvals have been issued. So, the question we must decide is whether the agreement required Metropolitan to obtain those approvals before it could become an owner in Cool Spring.

To the majority, the answer is yes. It concludes that in order for Metropolitan to become an owner, it had to first obtain the land use approvals to develop the property.

8

Adopting Cool Spring's argument, the majority labels this requirement a condition precedent. No approvals, no ownership interest.

But that is not what the parties agreed to. Three provisions directly contradict this conclusion.

First, paragraph 3.3(a) says that Metropolitan "shall use its commercially reasonable efforts to pursue and obtain" the land use approvals. Metropolitan's only obligation is to use "commercially reasonable efforts." It never agreed that it had to obtain the approvals before the joint venture could be formed. That is because "commercially reasonable efforts" modifies both "pursue and obtain." Such a reading follows the series-qualifier canon. Under it, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012).

The Supreme Court recently invoked this canon in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021). There, the question involved interpreting a statute which defined an autodialer as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator." *Id.* at 1169. Facebook argued that "using a random or sequential number generator" modified both verbs ("store or produce") while Duguid argued it modified only the closest verb ("produce"). *Id.* The Court agreed with Facebook and used the series-qualifier canon to qualify both antecedent verbs "store" and "produce" with the phrase "using a random or sequential number generator" because it produced the "most natural construction." *Id.* Similarly, here "commercially

9

reasonable efforts" most naturally applies to both "pursue" and "obtain." Metropolitan was not required to obtain the land use approvals. It was only required to use its "commercially reasonable efforts" to do so.

Nowhere does the agreement say that, before it may be issued an ownership interest in Cool Spring, Metropolitan must obtain the land use approvals. Nowhere does the agreement identify obtaining those approvals as a condition precedent. If obtaining the approvals were a condition for Metropolitan to become an owner in Cool Spring, you'd think the agreement might mention it somewhere.[1] But it doesn't. Cool Spring even admitted as much at oral argument. Even so, the majority writes into the agreement an obligation of Metropolitan to obtain the approvals.

Second, paragraph 3.3(b) says that if the government does not issue its approvals for the project by the end of what the parties called the "Entitlement Period,"[2] then "in Metropolitan's sole and absolute discretion, . . . Metropolitan may deliver written notice of such event" to Cool Spring and the agreement "shall terminate." Under this provision, if the land use approvals are not obtained, Metropolitan had the discretion to terminate the agreement by notifying Cool Spring. How can language that says it's up to Metropolitan's "sole and absolute discretion" whether it wants to terminate the agreement if the approvals

---

[1] Indeed, the parties knew how to craft express obligations using "shall" in the agreement for arguably less important items. *See* J.A. 23 ("Parcel Owners' LLC shall provide to Metropolitan copies of [the property information]."); J.A. 26 ("Metropolitan shall provide Parcel Owners' LLC with quarterly reports."). It would be strange to leave such a central element to the agreement unexpressed.

[2] In paragraph 3.2(a), the parties agreed that the Entitlement Period was to run two years, plus any amendments.

10

are not obtained be interpreted to mean that Metropolitan had to obtain the approvals to close? This right to walk away was not a two-way street. It only belonged to Metropolitan. Cool Spring's interpretation, and the majority's conclusion, writes this language out of the agreement.

Third, paragraphs 1.1(i) and (j) of the agreement combine to require the parties to close on Metropolitan's acquisition of an ownership interest in Cool Spring by a certain date. Under paragraph 1.1(i), the closing must take place on the date set by Metropolitan, and it cannot be any later than the "Outside Date." Paragraph 1.1(j) then defines the "Outside Date" to be 60 days "after the earlier of [the issuance of the land use approvals for the project] or . . . the expiration of the Entitlement Period." The "or" in paragraph 1.1(j) is crucial. Under that language, the closing must take place by the Outside Date: either 60 days after obtaining the approvals *or* 60 days after the expiration of the Entitlement Period. If the Entitlement Period expires as it did here, closing occurs even if the land use approvals have not been obtained. There is no way to square that language with a requirement that Metropolitan obtain the approvals to close on the joint venture. The majority's decision judicially substitutes "and" for "or" in paragraph 1.1(j).

These three provisions foreclose the majority's conclusion. We should apply them as written. We should neither write in new obligations nor write out existing rights.

11

II.

Despite paragraphs 3.3(a), 3.3(b), 1.1(i) and 1.1(j), the majority interprets the agreement to require Metropolitan to obtain the land use approvals before it could form the joint venture with Cool Spring. It gives two reasons for this conclusion. Neither is persuasive.

A.

First, according to the majority, interpreting "commercially reasonable efforts" in paragraph 3.3(a) to modify "pursue" and "obtain" renders "pursue" superfluous. If Metropolitan only had to use "commercially reasonable efforts" to obtain the land use approvals, the majority reasons, isn't that the same as using such efforts to pursue them? Not necessarily. A better reading is that the parties adopted a belt and suspenders approach to make sure they covered the point that Metropolitan did not have to obtain the approvals, just use its commercially reasonable efforts to try. There is nothing unusual here. Lawyers sometimes use overlapping terms to cover their bases. *See* U.S. Const. art. II, § 1, cl. 8 (The president takes an oath to "*preserve, protect and defend* the Constitution of the United States.") (emphasis added).

But even if the majority's interpretation of "pursue" is correct, it's only a small point. That's because superfluity exists under the majority's approach, too. By reading "commercially reasonable efforts" to modify only "pursue," the majority interprets paragraph 3.3(a) to mean that "Metropolitan shall . . . obtain" the land use approvals. But this approach would render "commercially reasonable efforts to pursue" superfluous. That is because if Metropolitan must actually obtain the approvals, what exactly does the

12

bargained-for obligation for Metropolitan to use its commercially reasonable efforts to pursue look like? The majority's interpretation also renders "Metropolitan shall have the right to" from paragraph 3.3(a), "in Metropolitan's sole and absolute discretion, . . . Metropolitan may" from paragraph 3.3(b) and the "or" from paragraph 1.1(j) meaningless. So, it's hard to give too much weight to this reasoning when the majority's reading creates superfluity in spades.

## B.

The majority also reasons that other parts of the agreement support its conclusion that Metropolitan had to obtain the land use approvals before obtaining its ownership interest. The majority points to four other provisions. But none of them support its conclusion.

## 1.

First, echoing Cool Spring's argument and the district court's conclusion, the majority points to the recital clauses of the agreement which state that the parties desire to develop the property. According to the majority, the property cannot be developed without obtaining the land use approvals. Thus, allowing Metropolitan to join Cool Spring without the approvals in hand would frustrate the purpose of the agreement.

It's of course true that the property cannot be developed until the land use approvals are issued. But nothing about interpreting the agreement as written—to require Metropolitan to be issued an ownership interest despite the lack of approvals—is inconsistent to the parties' desire to develop the property. Metropolitan still wants to develop the property and is still trying to obtain the approvals. Just because the approvals

13

have not yet been obtained, that does not indicate they will not be in the future. The majority's reasoning seems to be based on the flawed assumption that the parties' agreement contemplating the creation of the new joint venture depended on every "t" being crossed and every "i" being dotted so that there was only smooth sailing for the development of the property. The parties could, of course, have agreed to such a risk-averse arrangement. But they didn't. And there is nothing unusual about their not doing so. Real estate ventures are formed all the time with unresolved contingencies. That is all that is going on here.

What seems to concern the majority more is why Cool Spring would ever agree to give Metropolitan a 71% ownership interest when the government has not issued the land use approvals needed to develop the property. This concern is misguided for two reasons. One, we don't know why the parties agreed to each and every term. And it's really not our business if the agreement is clear—as it is here. *See Adloo v. H.T. Brown Real Estate, Inc.*, 686 A.2d 298, 304 (Md. 1996) ("[T]he clear and unambiguous language of an agreement will not give [way] to what the parties thought that the agreement meant or intended it to mean." (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985)). Even if the agreement gave Metropolitan an oversized ownership interest, we should enforce its terms as written.

Two, a closer look at the proposed joint venture operating agreement, which the parties attached as an exhibit to the agreement, provides some perspective. Under that proposed operating agreement, Cool Spring and Metropolitan were to set up capital accounts to identify the contributions that they made to the resulting joint venture after

14

Metropolitan became a majority owner. Cool Spring was to contribute the property. The parties assigned a value of $1.4 million to that contribution, an amount that exceeded the property's appraised value. Metropolitan in turn, as a professional developer, agreed to do all the work, and pay the costs of developing the property, as its contribution. Relevant here, under the proposed operating agreement, those capital accounts had to be paid out before the 71%-29% ownership split ever comes into play. In other words, before Metropolitan ever received any benefit from its 71% ownership in the joint venture, Cool Spring would be paid $1.4 million for its capital contribution. So, from an economic standpoint, Cool Spring would receive a generous sum for the property and then 29% of any profits from the development of the property without having to do, or pay for, any of the work to make the development happen. Considering all this, Metropolitan's 71% ownership interest makes more sense.

This payout structure also sheds light on why the agreement gave Metropolitan the right, if the land use approvals had not been obtained, to either go forward and obtain its ownership interest or walk away. Once the joint venture was formed, Metropolitan had significantly more risk than Cool Spring. It had to do all the work and pay all the money to pursue the development. And the development had to be successful enough to pay back the capital contributions and then produce profit on top of that for Metropolitan to enjoy the benefits of its 71% interest. Given those terms, it makes sense that Metropolitan would negotiate the right to walk away if the approvals had not been obtained—if it might not want to throw good money after bad—or go forward with the joint venture—if it was still confident that the property could be profitably developed.

15

And Cool Spring's risk was minimal either way—if Metropolitan elected to close, Cool Spring would receive $1.4 million before the 71%-29% profit split came into play. If Metropolitan elected to walk away, Cool Spring had the property all to itself.

Once again, the clear terms of the agreement control irrespective of the parties' intentions and whether or not it turned out to be a good or bad deal for either Cool Spring or Metropolitan. But the economic fundamentals of the deal show that interpreting the agreement as written and not writing a condition precedent into it would not frustrate the agreement's purpose.

2.

Second, the majority insists that paragraph 3.4 would be meaningless if Metropolitan were only required to make commercially reasonable efforts to obtain the land use approvals. But that is not right. Paragraph 3.4 gave Metropolitan the right to two six-month extensions to the Entitlement Period—which once again was a two-year period that was part of the timeline leading to the agreed deadline for closing—"[i]f Metropolitan [was] not successful in obtaining the Land Use Approvals during the Entitlement Period." This simply provided Metropolitan more time to pursue the approvals. It has no bearing as to what happens if the approvals are not obtained. In contrast, paragraphs 1.1(j) and 3.3(b) expressly address that contingency. Paragraph 1.1(j) required the closing to take place 60 days after the end of the Entitlement Period even if the approvals had not been obtained. And paragraph 3.3(b) gave Metropolitan the right to close or walk away if the approvals were not obtained. Nothing about paragraph 3.4 conflicts with those provisions.

16

3.

Third, the majority argues that paragraph 3.6(a) supports its conclusion. That provision permitted the members of Cool Spring to sell their interest in Cool Spring if Metropolitan managed to obtain the approvals during the Entitlement Period. But much like paragraph 3.4, this provision provides a right to the members of Cool Spring if the approvals are obtained. It doesn't say anything about what happens if they are not. And as already described, paragraphs 1.1(j) and 3.3(b) do.

4.

Fourth, the majority points to paragraph 2.3. That provision, after granting Metropolitan the right to record a document identifying its potential interest in the property, requires Metropolitan to release that recording it if did not obtain the approvals during the Entitlement Period. But that does not support the majority's conclusion either. During the Entitlement Period, without Metropolitan recording its interest, there would be no notice of that interest to the public. So, it makes sense that Metropolitan might record its interest to protect itself during that time. But at the end of the Entitlement Period, if it had not obtained the approvals, Metropolitan had the right under the agreement to protect itself without the recording—it could elect to close or walk away. Since it no longer needed the protection of a recorded interest at the end of the Entitlement Period, the requirement that it release the recording if the approvals had not been obtained does not support the majority's interpretation of the agreement.

In sum, none of those identified provisions tip the scales towards the majority's conclusion. In fact, they undermine it. Paragraphs 3.4, 3.6(a) and 2.3 show the parties

17

agreed to certain rights and obligations depending on whether or not the approvals were obtained. Despite doing so, nowhere did they make closing of the agreement conditional on obtaining the approvals. When parties negotiate and agree to terms based on a contingency, their silence on other obligations mean such obligations are not part of the agreement.

## III.

According to the majority, "[t]his case involves the interpretation of" the agreement. Maj. Op. 2. But rather than interpreting, the majority decides to re-write the agreement, adding a condition precedent that the parties never agreed to and removing Metropolitan's discretion to close on its ownership interest even if the land use approvals had not been obtained. I would do neither. I respectfully dissent.